USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ Nos. 96-1446, 97-1552 RAN CHOEUM, Petitioner, v. IMMIGRATION AND NATURALIZATION SERVICE, Respondent. ____________________ ON PETITION FOR REVIEW OF FINAL ORDERS OF THE BOARD OF IMMIGRATION APPEALS ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Richelle S. Kennedy, with whom Steven W. Hansen and Bingham, Dana ___________________ ________________ ______________ & Gould LLP were on brief, for petitioner. ___________ David V. Bernal, Senior Litigation Counsel, Office of Immigration _______________ Litigation, Civil Division, Department of Justice, with whom Philemina _________ McNeill Jones, Assistant Director, and Frank Hunger, Assistant ______________ _____________ Attorney General, Civil Division, Department of Justice, were on brief, for respondent. ____________________ November 5, 1997 ____________________ LYNCH, Circuit Judge. The difficulty of wending LYNCH, Circuit Judge. ______________ through this country's immigration laws -- for the immigrants involved, for the courts, and even for the federal agencies charged with enforcing the laws -- is illustrated by this case. For the courts, what is involved is properly ascertaining congressional intent in light of constitutional guarantees in decision of cases. For this Cambodian immigrant, Ran Choeum, what is involved is whether she will be deported, possibly back to that war-torn land she left when she was a child. She petitions for review of two decisions of the Board of Immigration Appeals ("BIA"), one dated February 9, 1996, denying her applications for asylum and withholding and for discretionary waiver, and one dated April 22, 1997, denying her motions to reopen. In the interim, the complexity of the immigration laws was enhanced by two new statutes. On April 24, 1996, the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), was signed into law. On September 30, 1996, (the same day Choeum moved to reopen before the BIA) the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"), was signed into law. Both statutes contain jurisdiction-stripping provisions removing from the federal circuit courts of appeals their previous jurisdiction over certain categories of final orders of deportation. -2- 2 This case was originally argued on May 9, 1997. In a decision dated July 2, 1997, we upheld the decisions of the BIA on reasoning which rejected particular arguments by both sides. Each party filed petitions for rehearing. The Immigration and Naturalization Service (INS), in its rehearing petition, for the first time raised a new argument that this court lacked jurisdiction to review both of the BIA orders because AEDPA 440(a) precludes jurisdiction over deportations for "aggravated felonies" under IIRIRA 321.  It would have been vastly preferable, of course, for the INS to have asserted this jurisdictional argument initially, and we have some concern about the government's burdening of immigrants with the obligation to respond to new-found statutory interpretations by the INS after a case has been heard and decided.1 Nonetheless, because rehearing was timely sought and parties may not waive issues of subject matter jurisdiction,2 we granted rehearing on particular issues. We withdraw our earlier opinion and restate in this opinion those of our earlier conclusions which remain  ____________________ 1. In another sense, however, Choeum is the beneficiary of the government's shifting position. Because mandate has never issued, and because Choeum has not been deported during the pendency of this appeal, the effect of the government's delay in making its new jurisdictional argument has been to delay Choeum's deportation. 2. See United States v. Baucum, 80 F.3d 539, 541 (D.C. Cir. ___ _____________ ______ 1996); Michigan Employment Security Comm'n v. Wolverine Radio ___________________________________ _______________ Co., Inc., 930 F.2d 1132, 1137-38 (6th Cir. 1991); Escobar _________ _______ Ruiz v. INS, 813 F.2d 283, 286 n.3 (9th Cir. 1987). ____ ___ -3- 3 pertinent. We conclude that we have jurisdiction to review the first decision of the BIA, which requires deportation, and sustain that decision on its merits. We conclude that we lack jurisdiction over the second BIA decision, denying Choeum's petition to reopen. I. Ran Choeum, an immigrant from Cambodia, pleaded guilty in New York state court to charges of burglary and kidnapping. The charges stemmed from a crime in which Choeum's boyfriend, seeking to settle a family grievance, murdered two elderly relatives of his sister's fianc . Choeum, who left the scene before the murders took place, pleaded guilty to burglary and kidnapping in order to avoid a possible murder conviction under the felony murder rule. While Choeum was in prison, deportation proceedings against her commenced.  Choeum seeks review of the BIA order of deportation of April 24, 1996. She argues that AEDPA changes the standard for determining whether an alien is eligible for withholding of deportation. She also argues that the Attorney General's regulation under which her application for asylum was denied exceeds the authority delegated to the Attorney General by Congress. Finally, she contends that the BIA abused its discretion in failing to grant her discretionary relief from deportation. She also petitions -4- 4 for review of the BIA's decision of April 22, 1997, denying her motion to reopen. The INS, for its part, argues that, under AEDPA, this court lacks jurisdiction to review Choeum's petitions. The jurisdictional argument comes in two parts. First, the INS argues that this court has no jurisdiction over either petition for review because AEDPA 440(a), 8 U.S.C.  1105a(a)(10), removes jurisdiction over deportations for "aggravated felonies" as that term is more broadly defined in IIRIRA 321(a), 8 U.S.C. 1101(a)(43). In light of the effective date provided in IIRIRA 321(c), we agree that there is no jurisdiction over the second petition on this ground, but the first petition survives this attack. Second, the INS argues there is still no jurisdiction over the first petition for review because she is an alien who has committed a firearms offense under 8 U.S.C. 1251(a)(2)(C), in this case, burglary, and AEDPA 440(a) does not permit review of deportations based on such grounds. We hold that judicial review remains available because in the agency deportation proceedings, Choeum was charged with deportability based only on her kidnapping offense, which is a crime of moral turpitude under 8 U.S.C. 1251(a)(2)(A)(i), and not with a firearms offense.  We further hold that the INS may not substitute alternative grounds for deportation at this stage in the -5- 5 proceedings, and that its argument fails both as a matter of statutory construction and because it raises due process concerns under the Constitution. Therefore, AEDPA does not deprive this court of jurisdiction to hear Choeum's first petition. Choeum's legal arguments, however, while ably made, do not convince us that the BIA erred in denying Choeum the various forms of relief sought. Accordingly, the BIA's decision is affirmed. II. Ran Choeum was born in a small Cambodian village in 1969. She was one of twelve children; her father was a soldier and her mother supported the family by rice farming. In 1973, her father was killed. The Khmer Rouge came to power in the area in 1975, and Choeum's mother, fearing retaliation for her husband's military activities, fled with her children to another village. Choeum's mother died in 1978 of starvation and illness. In 1979, Choeum's oldest sister brought Choeum and two other sisters, the only surviving members of the family, to a refugee camp in Thailand; they lived in various camps for the next five years. On March 27, 1985, Choeum and her sisters were admitted to the United States as refugees; Choeum was later granted permanent resident status, retroactive to that date. The Choeums' sponsors helped them to obtain welfare and -6- 6 housing. Choeum, who was fifteen at the time, had never been to school in Cambodia and spoke no English. Choeum briefly attended high school in Brooklyn, but dropped out when she became pregnant by her boyfriend, a Cambodian immigrant named Lak Ling. Choeum's son Wicky was born on January 2, 1987. At Lak Ling's request, Choeum and her son moved to Philadelphia to live with his relatives. In June 1988, Lak Ling, Choeum and the baby travelled to New York for Ling's sister's engagement party. When they arrived at Ling's parents' house, they learned that the sister, who was only fourteen, and her fianc , a twenty- eight year old Cambodian man, had disappeared and that the fianc 's family had not paid the $2,000 dowry owed Ling's family.  The next night, June 5, Choeum went outside to buy ice cream for her son. She saw Ling in a car with three Chinese men she did not know. Ling told her to get in the car, and told her that they were going to get his sister. When they arrived at a large apartment house on Ocean Avenue, Brooklyn, they all went upstairs and Ling told Choeum to knock on the door of the apartment where Ling's sister's fianc 's parents lived. No one answered. After driving around, they returned to the house and the Chinese men knocked on the door. One of the men was carrying a paper bag. -7- 7 This time, the door was opened. The men went in, and Choeum followed. The Chinese men began searching the apartment, while Ling talked to his sister's fianc 's parents. The Chinese men began piling up money and jewelry on the floor in front of the parents. One of the Chinese men brought two young children into the room. Ling instructed them to tie the children up. Ling assured Choeum that he was just trying to scare the parents into revealing where his sister was. The men brought the children into another room, took out a knife, cut the telephone cord, and bound the children with it. One of the children says that Choeum helped tie up the children and put tape on their mouths. According to Choeum, she merely watched, and then she noticed that her boyfriend was holding a gun. Choeum asserts that she became scared, went back into the other room, and untied the children; the Immigration Judge, however, did not credit this testimony. One of the men yelled at her to get out when he saw her near the children. All four men then screamed at Choeum to leave and wait in the car. She went outside and waited. When the men returned to the car fifteen minutes later, she asked if anything had happened; Ling assured her that everything was fine. Choeum returned to Ling's parents' house. The next morning, Choeum was arrested. It was then that she learned that the two adults at the Ocean Avenue -8- 8 apartment had been murdered. She was charged with a variety of crimes, but agreed to cooperate with the police and to help them find Ling. Facing a possible murder conviction, Choeum pleaded guilty to kidnapping in the third degree and burglary in the first degree, with a three to nine year sentence. While in prison, Choeum received favorable performance assessments, particularly from her teachers. She made rapid progress in English, and came close to achieving a GED despite her complete lack of formal education. Choeum was released in September 1991. She moved to Lowell, Massachusetts to live with her sisters and their children. She enrolled in job training programs, eventually finding a manufacturing job. The social services professionals who worked with her were impressed by her eagerness to work and to improve herself. In 1993, Choeum gave birth to a second son, David. David's father left her after she became pregnant and has no contact with his son. Choeum quit her job when she became pregnant with David, and receives welfare and food stamps. Choeum still resides near her sisters in Lowell, and helps them, as none of the others are proficient in English. Choeum's older son, Wicky, lives in Philadelphia with Lak Ling's parents, who gained custody of him during Choeum's imprisonment. Choeum does not see Wicky often, but speaks to -9- 9 him monthly on the phone. Choeum asserts in her most recent affidavit that she is pregnant with a third child. She also asserts that, because she fears for their safety, she would leave Wicky and David in this country were she to be deported to Cambodia. III. Deportation proceedings were initiated against Choeum with the issuance of an Order to Show Cause ("OSC") on September 18, 1990. The OSC charged Choeum with deportability pursuant to the then-current version of Section 241(a)(4)3 of the Immigration and Nationality Act ("INA"), in that she had been convicted of a crime of moral turpitude committed within five years after entry and sentenced to imprisonment for a year or more. The OSC stated that the crime of moral turpitude was kidnapping. The OSC did not refer to Choeum's burglary conviction either in the factual allegations or in the grounds for deportability. In her responsive pleadings, filed March 31, 1992, Choeum admitted the factual allegations in the OSC and conceded deportability as charged. She also sought the opportunity to apply for asylum, withholding of deportation, and waiver of deportability pursuant to INA 212(c), 8 U.S.C. 1182(c).  ____________________ 3. The section has been amended several times since then; the current version of the provision is Section 241(a)(2)(A)(i), 8 U.S.C. 1251(a)(2)(A)(i). -10- 10 A hearing was held before an Immigration Judge on August 7, 1992. The facts and circumstances of Choeum's crime were fully explored, including through testimony by Choeum's defense attorney. The Immigration Judge denied her applications for asylum under INA 208(a), 8 U.S.C.  1158(a), and for withholding of deportation under INA 243(h), 8 U.S.C. 1253(h), on the grounds that such applications must be denied if the alien, having been convicted of a particularly serious crime in the United States, constitutes a danger to the community. The Immigration Judge found that, based on all the evidence concerning Choeum's burglary and kidnapping convictions, she had "in fact been convicted of a particularly serious crime." He noted that the BIA has interpreted the statutory language to mean that an alien convicted of a particularly serious crime necessarily constitutes a danger to the community. Therefore, he ruled, Choeum was not eligible for asylum or withholding of deportation. Regarding Choeum's application for a discretionary waiver under INA 212(c), the Immigration Judge engaged in a careful balancing of the equities. Going through factors identified as significant by the BIA, the Immigration Judge found that Choeum's separation from Wicky and her sisters and the conditions in Cambodia were significant factors, but those facts did not overcome the egregious and horrible -11- 11 nature of her crime. On this ground, the Judge denied Choeum's application for discretionary waiver as well.  Choeum appealed the decision to the BIA, arguing that the equities, including the birth of her second child after the hearing, warranted an exercise of favorable discretion under INA 212(c), and that the Immigration Judge should have made a separate determination that Choeum posed a danger to the community before denying her applications for asylum and withholding of deportation. In a decision dated February 9, 1996, the BIA dismissed Choeum's appeal, reaffirming its view that an alien who has been convicted of a particularly serious crime necessarily constitutes a danger to the community and is ineligible for withholding of deportation and asylum. The BIA further found that the Immigration Judge gave proper consideration to the discretionary factors in denying Choeum's request for Section 212(c) relief. AEDPA was signed into law on April 24, 1996. Choeum's petition for review was filed with this court on May 9, 1996. On September 30, 1996, Choeum filed a motion to reopen with the BIA, based on new evidence, particularly the birth of David and the expectation of a third child, and on the argument that AEDPA 413(f), 8 U.S.C. 1253(h), removed the bar to withholding of deportation for aliens convicted of particularly serious crimes. The BIA denied Choeum's motion -12- 12 to reopen on April 22, 1997, finding that under AEDPA 440(d), Choeum was now statutorily ineligible for INA 212(c) relief, and rejecting her interpretation of AEDPA 413(f). Choeum has asked this court to review this decision as well. IV. A. Jurisdiction: The Effective Date of IIRIRA 321(c) ____________________________________________________ Correctly pointing out that Congress in the IIRIRA expanded the definition of "aggravated felonies" and precluded judicial review over deportations for aggravated felonies, the INS argues this court lacks jurisdiction over both petitions. Because we agree that kidnapping, the basis for the order deporting Choeum is an "aggravated felony,"4 the decisive question has to do with when this new definition became effective and the application of that effective date to the facts of this case. IIRIRA 321(c) establishes the "effective date" after which these definitions of "aggravated felony" are binding:  ____________________ 4. Under IIRIRA 321(a), an "aggravated felony" is "a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment at least one year." 8 U.S.C. 1101(a)(43)(F). A "crime of violence" is defined as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. 16(a). Because kidnapping satisfies the terms of 8 U.S.C. 16(a) and Choeum's term of imprisonment exceeded one year, Choeum committed an aggravated felony under IIRIRA 321(a).  -13- 13 The amendments made by this section shall apply to actions taken on or after the ______________ date of the enactment of this Act, regardless of when the conviction occurred . . . . IIRIRA 321(c) (emphasis added). The IIRIRA was enacted on September 30, 1996, so federal courts may not hear appeals from "actions taken" regarding final orders for deportation occurring after September 30, 1996 where the basis for deportation is commission (at any time) of an "aggravated felony." IIRIRA 321(c) does not itself define "actions taken." Neither of the interpretations offered by the parties appear appropriate. Choeum argues that the most sensible interpretation of "actions taken" is that it refers to immigration proceedings brought against the immigrant. Choeum thus characterizes "actions" in the immigration context as analogous to a civil action. Choeum cites Black's _____ Law Dictionary in support of this proposition, that "action" should be defined in its "usual sense" as a "lawsuit brought in court" -- i.e., the filing of the complaint. Under this ____ definition, "actions taken" would refer only to removal proceedings begun after September 30, 1996, with no _____ retroactive application to pending proceedings. The INS began removal proceedings against Choeum in 1990. The INS argues that "actions taken" means any ___ action taken regarding the case constitutes an "action -14- 14 taken." The INS argues that judicial review is such an action. Thus, this court's exercising of jurisdiction over the matter (by hearing the case in May, 1997), the INS argues, causes the court to be divested of jurisdiction. The INS relies for support on a two page, per curiam opinion in Mendez-Morales v. INS, 119 F.3d 738 (8th Cir. 1997), which ______________ ___ decides that "[b]ecause judicial review by this court would be an 'action taken' for purposes of IIRIRA 321(c), we have no jurisdiction to hear [petitioner's] appeal." Id. at 739. ___ That court did not explain this statement nor cite to authority. As to the second petition, the INS says that this court has no jurisdiction because, in any event, the BIA's denial of Choeum's motion to reopen her case constitutes an "action taken" after the September 30, 1996 date. We agree only with the latter argument. Both sides present untenable definitions in their arguments. It is not obvious that "action" in the immigration context does or should have the same meaning as an "action" in the civil context. The court of appeals review actions by the administrative agency in deportation cases and Choeum attacks four different actions on review. Choeum's position assumes there can be only one action, and that is the initial filing in a matter. The INS's position is also flawed: it is unlikely Congress intended the very act of exercising jurisdiction to trigger the destruction of -15- 15 that jurisdiction. If Congress had intended to affect every petition pending in a court, there was much clearer language available to express such an intent. Neither does it make sense that federal jurisdiction should be dependent on when a court schedules a hearing on a particular petition. For example, it seems irrational that a federal court would have jurisdiction over a matter if it heard argument on September 29, 1996, but would not have jurisdiction if it postponed the ___ ____ argument until October 1, 1996. Valderrama-Fonseca v. INS, 116 F.3d 853 (9th Cir. __________________ ___ 1997) is the only other opinion we have found that considers the definition of "actions taken" under IIRIRA 321(c). The facts are similar to this case. The INS sought to deport an alien because he had committed burglary, a crime of "moral turpitude;" the INS then argued that AEDPA 440(a) precluded judicial review of the final order of deportation because the crime was also an "aggravated felony" under 8 U.S.C. 1101(a)(43). There was no question that the alien's offense would constitute an "aggravated felony" if the revised definition were applicable under IIRIRA 321(c); hence the precise issue upon which jurisdiction depended was whether an "action" had been "taken" after September 30, 1996. The court offered three potential definitions of "actions taken." "Actions taken" could refer to: (l) orders -16- 16 and decisions issued against an alien by the Attorney General acting through the BIA or Immigration Judge, (2) steps taken by the alien, such as applying for discretionary relief, (3) to any action by anyone, including a circuit court. Id. at ___ 856. The court did not consider Choeum's proposed definition: that "actions taken" refers exclusively to the commencement of deportation proceedings against the alien. We largely agree with the holding of Valderrama- ___________ Fonseca. The third reading is improbable: it makes no sense _______ that federal jurisdiction should be based on the oral argument calendar. The second definition is plausible, as IIRIRA 309(c)(4)(A) refers to an "action for judicial review," which would be initiated by the client herself. But we need not decide the issue on the facts of this case. Choeum filed her first petition for review on May 9, 1996 well before the effective date. The first definition is the strongest and most sensible: that "actions taken" refers to actions and decisions of the Attorney General. "This makes logical and practical sense, as 'actions taken' is easily understood to encompass things done by an agency to an alien." Id. This interpretation is also consistent with how ___ the word "actions" is used in another section of the INA limiting federal court jurisdictional section of the INA, 8 U.S.C. 1252(g): Except as provided in this section and notwithstanding any other provision of -17- 17 law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter. We conclude that jurisdiction over Choeum's first petition is not removed by virtue of AEDPA 440(a). The decision of the immigration judge and the BIA's affirmance all occurred prior to October 1, 1996, so the revised "aggravated felony" rules in IIRIRA 321(a) do not apply. By the same reasoning, this court does not have jurisdiction ___ over Choeum's second petition, because the BIA's denial of Choeum's motion to reopen occurred on April 22, 1997, which is after the October 1, 1996 triggering date for _____ applicability of the "aggravated felony" rules. We dismiss the second petition. B. Jurisdiction: AEDPAand Basis for BIA's Deportation Order _________________________________________________________ The INS also filed a motion to dismiss with this court, arguing that Section 440(a) of AEDPA, apart from IIRIRA, deprives this court of jurisdiction to hear this case. That section ousts the jurisdiction of the federal courts to review the deportation petitions of, among other classes of aliens, aliens deportable by reason of firearms offenses under 8 U.S.C. 1251(a)(2)(C). The INS contends that Choeum's burglary conviction was such an offense. However, at the deportation proceedings, the INS did not -18- 18 assert the burglary offense as a basis for deportation. Instead, the INS rested on the kidnapping offense, although the INS did not argue that the kidnapping was also a firearms offense. The INS's argument seems to be that because it might have sought to deport Choeum based on her burglary- _____ firearms conviction, even though it chose not to do so, this ___ court lacks jurisdiction to review Choeum's deportation based upon her kidnapping non-firearms offense because this court lacks jurisdiction over a burglary-firearms based deportation, even though this was not the basis for deportation. Section 440(a) of AEDPA amended Section 106(a)(10) of the INA, 8 U.S.C. 1105a(a)(10),5 to provide that final orders of deportation against aliens who are "deportable by reason of having committed" certain types of criminal offenses, including firearms offenses, "shall not be subject to review by any court." AEDPA 440(a), 110 Stat. at 1276- 77. This provision of AEDPA applies to pending cases.  ____________________ 5. Section 106 of the INA, 8 U.S.C. 1105a was repealed by 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009- 546 ("IIRIRA"); IIRIRA substitutes new judicial review provisions. See IIRIRA 306(a), 8 U.S.C. 1252. However, ___ this repeal applies only to final orders of deportation and motions to reopen filed on or after April 1, 1997. See ___ IIRIRA 306(c), 309, 110 Stat. at 3009-612, 625, as amended __________ by Pub. L. 104-302, 110 Stat. 3656 (Oct. 11, 1996)(technical __ amendment clarifying that judicial review provisions of IIRIRA are not effective upon enactment). IIRIRA also provides transitional rules for certain classes of cases, see ___ infra. _____ -19- 19 Kolster v. INS, 101 F.3d 785, 790 (1st Cir. 1996). Under _______ ___ AEDPA, judicial review remains available to aliens who have committed other types of offenses, including aliens who have been convicted of only one crime of moral turpitude. See ___ AEDPA 440(a); 8 U.S.C. 1251(a)(2)(A). The INS contends that the first degree burglary charge to which Choeum pleaded guilty was a firearms offense as defined by Section 241(a)(2)(C) of the INA, which renders deportable any alien who "is convicted under any law of . . . using . . . any weapon . . . which is a firearm . . . in violation of any law." 8 U.S.C. 1251(a)(2)(C). Therefore, the INS contends, Choeum is "deportable by reason of having committed" a firearms offense and Section 440(a) of AEDPA deprives this court of jurisdiction to hear her petition. Choeum makes two responses to the INS's argument. First, Choeum argues that she was not, in fact, convicted of a firearms offense, as her plea colloquy reveals that she herself did not "use" a handgun.6 Second, Choeum points out,  ____________________ 6. Under New York law, a person is guilty of burglary in the first degree "when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime: ________________________________ 1. Is armed with explosives or a deadly weapon; or 2. Causes physical injury to any person who is not a participant in the crime; or  3. Uses or threatens the immediate use of a dangerous instrument; or  4. Display what appears to be a pistol, revolver, rifle, shotgun, machine gun, or other firearm . . . ." N.Y. Penal Law 140.30 (emphasis added). -20- 20 correctly, that the OSC only referenced the kidnapping conviction.  It is undisputed that the burglary conviction was not charged as a basis for deportation in the OSC, and that Choeum's concession of deportability only encompassed the grounds charged in the OSC, i.e. that she was in fact ____ deportable because the kidnapping conviction was a crime of moral turpitude. The Immigration Judge did, as the INS points out, hear extensive testimony on the nature of Choeum's crime. Notably, however, he did not attempt to determine whether Choeum had used a firearm, because that was not an issue in the proceedings before him.  The INS's argument is essentially a linguistic one. According to the INS, for purposes of jurisdiction, aliens "deportable by reason of" having committed firearms offenses ____ are not only those aliens who have been ordered deported for __________________________ firearms offenses, but also those aliens who could be _________ deported for that reason. As a matter of statutory construction, that argument is somewhat illogical: The contested phrase comes from Section 440(a) of AEDPA, a statutory section solely concerned with final orders of deportation. The section therefore applies, by its very terms, only to aliens who have actually been adjudged  ____________________ Thus, under New York law, Choeum could be convicted of burglary in the first degree simply by virtue of Ling's use of the gun. -21- 21 deportable. It is therefore highly doubtful that, in that context, Congress meant "deportable by reason of" to mean, as the INS would have it, "potentially susceptible to being deported by reason of . . ."  The reading of the statute that the INS proposes also raises due process concerns. "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." Reno v. Flores, 507 U.S. ____ ______ 292, 306 (1993). At the core of these due process rights is the right to notice of the nature of the charges and a meaningful opportunity to be heard. See, e.g., Kwong Hai ___ ____ _________ Chew v. Colding, 344 U.S. 590, 596-98 (1953); Kaczmarczyk v. ____ _______ ___________ INS, 933 F.2d 588, 596 (7th Cir. 1991)(citing cases).  ___ We do not need to determine what form of notice would be constitutionally required, because the statutory and regulatory scheme under which deportation proceedings are conducted mandate specific procedures. The INA itself provides that, in deportation proceedings, written notice -- referred to as an order to show cause -- shall be given to the alien specifying, among other things, "[t]he charges against the alien and the statutory provisions alleged to be have been violated." 8 U.S.C. 1252b(a)(1)(D). INS regulations permit the INS to lodge additional charges of deportability "at any time during a hearing" before an Immigration Judge, but specifically state that these charges -22- 22 must be submitted in writing for service on the alien and for entry into the record, that the Immigration Judge shall read the additional charges to the alien and explain them to her, and that the alien may have a reasonable time, including requesting a continuance, to respond to additional charges. 8 C.F.R. 242.16(d). It is undisputed that the INS did not, at any time, reopen deportation proceedings to comply with these statutory and regulatory formalities. In United States v. Hirsch, 308 F.2d 562 (9th Cir. _____________ ______ 1962), the BIA had ordered petitioner deported on the basis of crimes which were admitted into evidence at his deportation hearing, but which were never added to the INS's charge against him. The court found that this procedure not only violated INS regulations similar to the ones discussed above, but also contravened basic notions of procedural due process: [A]t all pertinent times, petitioner was entitled to a statement of the charges against him, to a hearing of those charges, and to answer them.  Procedural due process requires no less, and such due process is required in such a hearing. We have frequently commented upon the severity of the remedy of deportation, with the consequent requirement that prescribed procedures must be followed for the protection of the alien. Surely being advised of the charges upon which the proceeding is based is fundamental to due process. Id. at 566-67 (internal citations omitted). ___ -23- 23 Here the INS is not actually attempting to deport the petitioner on uncharged grounds, but rather using uncharged grounds to cut off judicial review. However, this court has found that even arguably lesser deprivations of notice and the opportunity to be heard "ran afoul of petitioner's procedural rights." Gebremicheal v. INS, 10 ____________ ___ F.3d 28, 39 (1st Cir. 1993) (holding that BIA could not rely on extra-record facts concerning human rights in Ethiopia without affording petitioner an opportunity to respond). In these circumstances, where the word "deportable" has a meaning that the context makes plain, and the INS asks us to choose a different interpretation, we are influenced by the maxim of statutory construction that tells us to interpret statutes so as to avoid constitutional concerns. See, e.g., ___ ____ Frisby v. Schultz, 487 U.S. 474, 483 (1988); United States v. ______ _______ _____________ Three Juveniles, 61 F.3d 86, 90 (1st Cir. 1995). We ________________ therefore reject the INS's suggested interpretation of Section 440(a)'s use of "deportable by reason of."  The INS suggests that this court can make the necessary determination that Choeum's offense was a firearms offense, implying that briefing and argument before this court provide sufficient notice. The INS points out that in Kolster, we termed deportability "a largely mechanical _______ determination based on facts that can often be objectively ascertained." 101 F.3d at 789. That description, of course, -24- 24 assumes that the necessary facts will be before the decision maker. Use of a firearm not being an issue in the proceedings below, the record before this court cannot be considered complete and the INS argument fails on pragmatic grounds.7 More importantly, it is not the institutional role of this court to serve as a factfinding body on issues of first impression.  We hold that the INS cannot, consistent with due process and the statutory and regulatory requirements governing its own proceedings, substitute new grounds for deportation at this stage in the proceedings, solely for the purposes of depriving the federal courts of jurisdiction.8  ____________________ 7. The INS draws our attention to Yang v. INS, 109 F.3d 1185 ____ ___ (7th Cir. 1997). In that case, petitioner contested the administrative finding that he was deportable by reason of having committed certain crimes, crimes which would render him ineligible, under AEDPA, for judicial review of his deportation order. The Seventh Circuit asserted that "a court has jurisdiction to determine whether it has jurisdiction" and reviewed the record to see if the law had been properly applied to petitioner's case. Id. at 1192. ___ That situation, where the court reviews the administrative record to determine if the law has been correctly applied to petitioner's case, is not analogous to the situation here, where the question to be answered was not addressed in the proceedings below. 8. To the extent that Abdel-Razek v. INS, 114 F.3d 831 (9th ___________ ___ Cir. 1997), takes a different position on this issue, we find it unpersuasive. But we do not believe that Abdel-Razek ___________ really conflicts with our conclusion. Abdel-Razek, and ___________ Mendez-Morales v. INS, 119 F.3d 738 (9th Cir. 1997), which ______________ ___ the INS also cites, both involve aliens who had committed a single crime which was the sole basis for their respective deportations, and the issue was whether the INS could substitute one ground for deportation, i.e., commission of a ____ crime of moral turpitude, for another, i.e., an aggravated ____ -25- 25 We therefore need not determine whether or not Choeum's conviction for burglary in the first degree constitutes a firearms offense. We turn to Choeum's claims of legal error, based on the grounds on which the INS actually proceeded.  V. Choeum appeals the February 9, 1996 denial of her applications for three separate types of relief from deportation: (1) withholding of deportation under Section 243(h) of the INA, 8 U.S.C. 1253(h); (2) asylum under 8 U.S.C. 1158;9 and (3) discretionary waiver of deportability under Section 212(c) of the INA, 8 U.S.C. 1182(c).10 We address each of these claims in turn.  ____________________ felony. This a different situation than we have in the present case, where Choeum had committed two different crimes, and the INS wishes to use one crime as the basis for deportation but then the other crime as the basis for denying _____ this court jurisdiction. By citing Abdel-Razek as authority ___________ that opposes this conclusion, the INS confuses the legal grounds for deportation with its underlying factual basis. 9. Withholding of deportation and asylum are similar in that both offer relief from deportation based on the likelihood of persecution in the alien's home country. Asylum requires a greater showing than withholding, and carries with it the entitlement to become a lawful permanent resident, and eventually a citizen. Withholding, on the other hand, does not give the alien the automatic right to remain in the United States; the alien may still be deported to a third country in which she would not face persecution. See INS v. ___ ___ Cardoza-Fonseca, 480 U.S. 421, 428 n.6 (1987). _______________ 10. Section 212(c), by its express terms, permits the Attorney General to waive the exclusion of otherwise excludable aliens; a longstanding interpretation extends this discretionary authority to the waiver of deportation. Kolster, 101 F.3d at 787. _______ -26- 26 A. Withholding of Deportation _____________________________ Choeum's argument with regard to withholding of deportation again requires us to consider the effect of AEDPA's amendments to the immigration laws. Section 243(h)(1) of the INA, 8 U.S.C. 1253(h)(1), provides that: The Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion. An alien who meets this standard of eligibility, and who does not fall under a statutory exception, is entitled to ________ withholding of deportation; the Attorney General does not have discretion in Section 243(h) proceedings. Cardoza- ________ Fonseca, 480 U.S. at 429. However, Section 243(h)(2) does _______ enumerate several classes of aliens to whom Section 243(h)(1) does not apply. 8 U.S.C. 1253(h)(2). One such exception is where "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C.  1253(h)(2)(B)("the Particularly Serious Crime Exception"). The BIA has interpreted this exception to require only a determination of whether an alien's crime is "particularly serious"; according to the BIA, an alien convicted of a particularly serious crime necessarily -27- 27 constitutes a danger to the community. See, e.g., Matter of ___ ____ _________ K-, 20 I. & N. Dec. 418, 1991 WL 353530, *3 (BIA Nov. 5, __ 1991); Matter of Carballe, 19 I. & N. Dec. 357, 360 (BIA __________________ 1986)("The phrase 'danger to the community' is an aid to defining 'particularly serious crime,' not a mandate that administrative agencies or the courts determine whether an alien will become a recidivist."). This court, while acknowledging that there is "considerable logical force" to the argument that the Particularly Serious Crime Exception requires a separate determination of dangerousness to the community, has upheld the agency's interpretation under Chevron U.S.A., Inc. v. Natural Resources Defense Council, _____________________ ___________________________________ Inc., 467 U.S. 837 (1984). See Mosquera-Perez v. INS, 3 F.3d ____ ___ ______________ ___ 553 (1st Cir. 1993). The Immigration Judge here made a specific finding that Choeum's crime was a particularly serious one, and then, applying the BIA interpretation of the Exception, determined that Choeum was ineligible for withholding of deportation. The BIA similarly rejected Choeum's argument that she was entitled to a separate determination of whether she poses a danger to the community. Were it not for AEDPA, that, under Mosquera-Perez, would be the end of it. ______________ However, in Section 413(f) of AEDPA, Congress amended Section 243(h) of the INA to include a new subsection (h)(3). The new provision states, in relevant part: -28- 28 Notwithstanding any other provision of law, paragraph (1) [the withholding provision] shall apply to any alien if the Attorney General determines, in the discretion of the Attorney General, that . . . (B) the application of paragraph (1) to such alien is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees. 8 U.S.C. 1253(h)(3). Choeum argues that, by directing that the withholding provisions be applied so as to "ensure compliance" with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (the "Protocol"), "not withstanding any other provision of law," Congress incorporated the Protocol into United States statutory law. The Protocol, Choeum argues, requires a separate, individualized determination that the alien is currently a danger to the community. Thus, according to _________ Choeum, Section 413(f) of AEDPA expressed a congressional intent to reject the BIA's rulings that Section 243(h)(2) requires only a determination that the alien has been convicted of a particularly serious crime.11  ____________________ 11. The INS initially argued that Section 413(f) of AEDPA did not apply to Choeum's case, as AEDPA Section 413(g) instructed that the amendments made by Section 413(f) should apply only to those applications on which final action had not been taken before the date of AEDPA's enactment, i.e. ____ April 30, 1996. See AEDPA 413(g), 110 Stat. 1269-70. The ___ BIA denied Choeum's application for withholding on February 9, 1996; the INS argued that this - not judicial review - constituted "final action" on Choeum's application, and that -29- 29 The Protocol binds its signatories to compliance with the substantive provisions of the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, 176 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) (the "Convention"). Article 33.1 of the Convention prohibits the "refoulement" -- the forced return or expulsion -- of a refugee to territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion. Art. 33.1, 19 U.S.T. at 6276. Article 33.2 of the Convention provides an exception to this principle of "nonrefoulement": The benefit of the present provision may not, however, be claimed by a refugee for whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, ____ having been convicted by a final judgment _________________________________________ of a particularly serious crime, _________________________________________ constitutes a danger to the community of _________________________________________ that country. ____________ Art. 33.2, 19 U.S.T. at 6276(emphasis added). The United States statutory law on withholding, including the Particularly Serious Crime Exception, thus closely mirrors the language of the Convention. (This is not surprising, as Congress, when it enacted the relevant provisions of Section 243(h) in 1980, specifically intended  ____________________ Section 413(f) was therefore inapplicable to Choeum's case. We need not decide whether the INS's interpretation of "final action" is the correct one.  -30- 30 to bring United States refugee law into conformance with the Protocol. See Cardoza-Fonseca, 480 U.S. at 436-37; Mosquera- ___ _______________ _________ Perez, 3 F.3d at 556.) As the express terms of the _____ Convention do not differ from those of the United States' Particularly Serious Crime Exception, the explicit reference to the Protocol in AEDPA's Section 413(f) would not appear to modify that Exception. Choeum argues, however, that Section 413(f) expresses a congressional intent to incorporate the United Nations' interpretation of the Protocol's withholding provisions into United States immigration law. She refers this court to an advisory opinion on AEDPA issued by Representative Anne Willem Bijleveld of the United Nations High Commissioner for Refugees ("UNHCR") to the American Immigration Lawyers Association, and to the UNHCR Handbook on ___________ Procedures and Criteria for Determining Refugee Status _____________________________________________________________ (1979)("UNHCR Handbook").  Mr. Bijleveld's opinion takes the position that the Protocol requires a signatory state to make a separate determination that the refugee it seeks to expel is a danger to the community. The UNHCR Handbook, for its part, does not unambiguously support Choeum's position. The UNHCR Handbook, while requiring an individualized determination of the applicability of Article 33.2's exclusion clause, focusses on the definition of "serious non-political crime" and does not -31- 31 explicitly require a separate dangerousness determination. See UNHCR Handbook, supra, 154-57, at 36-37. ___ _____ The INS, in contrast, points this court to Matter ______ of Q-T-M-T-, Interim Dec. 3300, 1996 WL 784581, *16 (BIA Dec. ___________ 21, 1996). In Matter of Q-T-M-T-, the BIA held that Section ___________________ 413(f) of AEDPA did not require a separate dangerousness determination: [W]e have consistently held that neither the Convention and Protocol nor section 243(h)(2)(B) of the Act requires a separate "dangerousness" determination "focusing on the likelihood of future misconduct on the part of the alien." . . . [E]very reviewing court reaching this issue has sustained our prior holding in this regard. Indeed, in 1995, the Attorney General issued a regulation adopting this construction of section 243(h)(2)(B). 8 C.F.R.  208.16(c)(2)(ii)(1995). Moreover, there is nothing in the legislative history of either the AEDPA or the IIRIRA suggesting that Congress had any intent to override this well-settled construction of the law. And, particularly in enacting the IIRIRA, Congress reflected its ability to clearly address and override Board and judicial constructions of the law which it deemed erroneous. Thus, we do not find our ruling on this issue [to be] affected by section 243(h)(3) of the Act. Id.  ___ The INS further argues that the reason for enacting Section 413(f) was that AEDPA expanded the definition of "aggravated felony" to include crimes that might be considered less serious than those the Protocol intended to cover in its exclusion clause. Section 243(h)(2) of the INA, -32- 32 8 U.S.C. 1253(h)(2), expressly states that, for withholding purposes, "an alien convicted of an aggravated felony shall be considered to have committed a particularly serious crime." The INS contends that AEDPA Section 413(f) was thus intended to preserve the Attorney General's flexibility in assessing whether crimes now defined as aggravated felonies were, in fact, "particularly serious" within the meaning of the Protocol. In interpreting Section 413(f) of AEDPA, we must first determine if the statutory language makes the intent of Congress clear and unambiguous; if the statute is ambiguous, we give deference to the BIA's interpretation of the immigration laws, unless that interpretation is arbitrary, capricious, or contrary to the statute. Chevron, 467 U.S. at ________ 842-45 (1984); Mosquera-Perez, 3 F.3d at 554. ______________ The plain language of Section 413(f) is not very illuminating. It directs the Attorney General to ensure compliance with the Protocol, yet as noted, the language of the Protocol's withholding provisions has already been codified as United States statutory law. Section 413(f) thus appears, at first glance, to be surplusage. The legislative history of AEDPA is similarly unhelpful. The import of Section 413(f) is thus ambiguous, and we turn to the agency interpretation. The reasoning behind the BIA's interpretation is fairly persuasive. Congress is -33- 33 presumed to be aware of the BIA's longstanding construction of the Particularly Serious Crime Exception. See Mosquera- ___ _________ Perez, 3 F.3d at 559. If Section 413(f) of AEDPA were meant _____ to correct that construction, Congress certainly would have done so in a less oblique fashion. We also note that Section 413 of AEDPA, as a whole, is entitled "Denial of Other Relief to Alien Terrorists," and that the legislation shows few, if any, indications of having intended to expand the rights of ______ criminal aliens. In this context, the INS's explanation of why Section 413(f) was enacted is certainly a reasonable one. In turn, Choeum's arguments are unpersuasive. As noted, the UNHCR Handbook does not unambiguously support her interpretation of the Protocol. Moreover, the Supreme Court, while acknowledging that the UNHCR Handbook is "useful in giving content to the obligations that the Protocol establishes," expressly disclaimed the suggestion that the Handbook had "the force of law or in any way binds the INS." Cardoza-Fonseca, 480 U.S. at 439 n.22.  _______________ In this context, where the statute is ambiguous, and the BIA has offered a reasonable interpretation of its provisions, it would be improper for this court to substitute the advisory opinion of an international body for the reasoned judgment of the domestic administrative agency with primary responsibility for administering the statute. Accordingly, we find that the interpretation of Section -34- 34 243(h)(2)(B) and Section 243(h)(3) adopted by the BIA is not unreasonable, arbitrary, or capricious. Consequently, a separate inquiry into Choeum's dangerousness to the community was not required. See Mosquera-Perez, 3 F.3d at 559. Choeum ___ ______________ was not eligible for withholding of deportation. B. Asylum _________ Choeum next argues that the regulation under which she was deemed ineligible for asylum exceeds the authority delegated to the Attorney General by Congress.  An INS regulation provides that: "An application for asylum shall be denied if . . . [t]he alien, having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community . . . ." 8 C.F.R. 208.14(d)(1).12 This regulation was promulgated pursuant to then-current Section 208(a) of the INA, 8 U.S.C. 1158(a),13 which provided: The Attorney General shall establish a procedure for an alien . . . to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney  ____________________ 12. 8 C.F.R. 208.14(d) previously appeared at 8 C.F.R.  208.14(c), and is referred to by its former designation in the administrative proceedings in this case, and in the cases discussed herein. 13. Section 604 of IIRIRA, "Asylum Reform," substantially amends Section 208 of the INA, 8 U.S.C. 1158. However, Section 604 of IIRIRA applies only to applications for asylum filed on or after April 1, 1997. See IIRIRA 604(c), 110 ___ Stat. 3009-694. References in this opinion are to the earlier version of 8 U.S.C. 1158, which may be found at 8 U.S.C.A. 1158 (West 1996). -35- 35 General if the Attorney General determines that such alien is a refugee within the meaning of . . . this title. Choeum points out that, in 1990, the same year that the challenged regulation was adopted, Congress enacted what was then 8 U.S.C. 1158(d), which provided that "[a]n alien who has been convicted of an aggravated felony . . . may not apply for or be granted asylum." 8 U.S.C. 1158(d). Choeum argues that, by negative implication, Congress did not intend a similar per se bar for aliens convicted of particularly ___ __ serious crimes, and that the Attorney General exceeded the authority delegated by Congress in barring a larger class of aliens than that barred by statute. The statute expressly conferred broad authority on the Attorney General to "establish a procedure" for asylum applications, and the granting of asylum is explicitly left to the Attorney General's discretion. Under Chevron, where _______ Congress "explicitly left a gap for the agency to fill," and where there is thus "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," we should uphold a gap-filling regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843-44. _______ The Attorney General's determination that aliens convicted of particularly serious crimes should be ineligible for asylum is not unreasonable. Applying Chevron, we do not _______ -36- 36 find that the regulation exceeds the broad grant of authority conferred by the enabling statute. Accordingly, Choeum's application for asylum was properly denied. We note that the two other circuits to have considered the argument made here by Choeum have also upheld the regulation. See Ahmetovic v. ___ _________ INS, 62 F.3d 48, 51 (2d Cir. 1995)(finding that Congress did ___ not intend to limit agency's power to impose a higher standard on asylum seekers); Komarenko v. INS, 35 F.3d 432, _________ ___ 436 (9th Cir. 1994)(noting similarity of asylum regulation to statutory withholding provisions for aliens who have committed particularly serious crimes).14  C. 212(c) Waiver ________________ Choeum also argues that the BIA abused its discretion in denying her application for a waiver of deportation under Section 212(c) of the INA, 8 U.S.C.  1182(c). The BIA denied Choeum's application for Section 212(c) relief twice, first when affirming the Immigration Judge's decision and again when denying Choeum's motion to reopen. We consider only the first of these denials. See 8 ___ U.S.C. 1105a(a)(6)("[W]henever a petitioner seeks review of  ____________________ 14. We also note that, in the asylum provisions of IIRIRA, Congress has made aliens who have been convicted of particularly serious crimes ineligible for asylum, and explicitly stated that the Attorney General may provide, by __________ regulation, additional limitations and conditions on the consideration of an application for asylum. See 8 U.S.C.  ___ 1158(b)(2)(A)(ii); 1158(d)(5)(B) (1997 version). -37- 37 an order under this section, any review sought with respect to a motion to reopen or reconsider such an order shall be consolidated with the review of the order.").15  We only have jurisdiction to review the BIA's initial denial of Section 212(c) relief. Relief under Section 212(c) is discretionary, and review by this court is for abuse of discretion. See, e.g., Hazzard v. INS, 951 F.2d ___ ____ _______ ___ 435, 438 (1st Cir. 1991). We will uphold such a denial unless it was made "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Id.  ___ Here, the BIA found that the Immigration Judge "gave proper consideration to the discretionary factors." We agree, and can find no abuse of discretion. Choeum's crime was, as the Immigration Judge found, profoundly disturbing. Choeum argues that the Immigration Judge improperly determined that she showed little remorse. However, the Immigration Judge observed her demeanor and heard her testimony. This finding essentially turns on Choeum's credibility and does not provide a basis to overrule the BIA. Choeum also argues that the Immigration Judge improperly emphasized her reliance on welfare, by failing to consider  ____________________ 15. As noted, IIRIRA repealed 8 U.S.C. 1105a. See supra ___ _____ note 2. IIRIRA does adopt a consolidation provision that is substantially similar to the old provision. See IIRIRA  ___ 306(a)(2) (current 8 U.S.C. 1252(b)(6)).  -38- 38 the circumstances that have made it difficult for her to work. Many of these circumstances are of Choeum's own making. Moreover, many, if not most immigrants, face language and educational barriers that make finding employment challenging.  Choeum's only argument of substance is that, by affirming the decision of the Immigration Judge "based upon and for the reasons set forth in that decision," the BIA apparently did not consider the new evidence of the post- hearing birth of her son David. The INS replies that the BIA is an appellate body and that Choeum failed to comply with the proper procedure for presenting new evidence, which is to move to reopen proceedings before the Immigration Judge, see ___ 8 C.F.R. 3.2. While the BIA may, in its discretion, consider new evidence presented for the first time on appeal, it is certainly appropriate for the BIA to insist on compliance with the proper procedures. Fair proceedings are best assured through proper entry into the record of all relevant evidence, and through the ability of the factfinder to sift that evidence. The BIA has given notice, in earlier decisions, that it may refuse to consider new evidence that is not part of the record before the Immigration Judge. See, ___ e.g., Matter of C-, 20 I. & N. Dec. 529, 1992 WL 200361, *6 ____ ____________ (BIA May 28, 1992). In these circumstances, the BIA's -39- 39 insistence that the procedural formalities be observed cannot be considered an abuse of discretion.16 Accordingly, the decisions of the BIA challenged in the first petition are affirmed. The second petition is ________ dismissed.  ____________________ 16. We also note that the birth of a second child was unlikely to substantially shift the equities of petitioner's case. While it is true that Choeum has a second child, he is very young, allegedly has no relationship with his father, and presumably does not yet have significant ties to the United States. Additionally, the BIA, by relying on the record before the Immigration Judge, did not consider the other post-hearing events in Choeum's life, including quitting her job, returning to reliance on welfare, and failing to pursue further her GED or other educational avenues.  -40- 40