# United States Court of Appeals
## For the First Circuit

Nos. 16-2272, 17-1402

LIZBETH PATRICIA VALERIO-RAMIREZ,

Petitioner,

v.

JEFFERSON B. SESSIONS, III,
ATTORNEY GENERAL,

Respondent.

PETITIONS FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Mary P. Holper and Boston College Legal Services LAB Immigration Clinic for petitioner.
John Willshire Carrera and Philip L. Torrey on brief for Harvard Immigration and Refugee Clinical Program and Immigrant Defense Project, amici curiae.
Margaret Kuehne Taylor, Senior Litigation Counsel, Office of Immigration Litigation, with whom Chad A. Readler, Acting Assistant Attorney General, Civil Division, and Derek C. Julius, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

February 15, 2018

**LYNCH, Circuit Judge.** This case involves what constitutes a "particularly serious crime," the commission of which renders a petitioner ineligible for withholding of deportation or removal.

The case is before this court for the second time. An Immigration Judge ("IJ") determined that Lizbeth Valerio-Ramirez's ("Valerio") conviction for aggravated identity theft was a "particularly serious crime" that rendered her ineligible for withholding of removal under 8 U.S.C. § 1231(b)(3)(B)(ii). The Board of Immigration Appeals ("BIA") affirmed, but noted in passing that Valerio was subject to deportation, under 8 U.S.C. § 1253(h), not removal. On petition for review, this court vacated the BIA's decision and remanded to the BIA to clarify the applicable legal standard. Velerio-Ramirez v. Lynch, 808 F.3d 111 (1st Cir. 2015). On remand, the BIA concluded that in deportation and removal proceedings alike, its longstanding framework under Matter of Frentescu supplies the standard for determining whether a non-aggravated felony qualifies as a "particularly serious crime." See 18 I. & N. Dec. 244, 247 (B.I.A. 1982). Reiterating its prior reasoning, the BIA again found Valerio ineligible for withholding.

We find no error as to the applicable legal framework adopted by the BIA. We also find that we have jurisdiction to review the merits of the BIA's determination that Valerio's crime is "particularly serious." Having carefully reviewed the record,

we conclude that the BIA did not abuse its discretion. Accordingly, we deny Valerio's petitions for review.

## I. **Background**

In March 1991, Valerio, a native and citizen of Costa Rica, entered the United States without inspection. She was apprehended and placed in deportation proceedings, which were administratively closed when she failed to appear at her initial hearing.

Soon thereafter, Valerio's then-boyfriend Carlos Gomez purchased her a birth certificate and social security card in the name of Ms. Rosa Hernandez, a U.S. citizen who lived in Puerto Rico. From 1995 to 2007, Valerio used Hernandez's identity to secure employment, open numerous lines of credit, and purchase two cars and a home. Valerio also used Hernandez's identity to defraud the government of over $176,000 in housing assistance, food stamps, and other welfare benefits. In 2006, the real Rosa Hernandez learned while trying to purchase a car that someone had opened lines of credit under her name. A year later, Valerio was apprehended, and in 2010, after a jury trial in federal court, she was found guilty of one count of aggravated identity theft under 18 U.S.C. § 1028A and three counts of mail fraud under 18 U.S.C.

§ 1341. She was sentenced to two years' imprisonment, the mandatory minimum. See 18 U.S.C. § 1028A(a)(1).

In 2011, after Valerio had served her sentence, the Department of Homeland Security ("DHS") reopened her deportation proceedings. By then, Congress had replaced "deportation," subject to § 1253, with "removal," subject to § 1231. DHS mistakenly treated Valerio as being in removal proceedings, and Valerio in turn applied for both asylum and withholding of removal.[1]

In 2013, the IJ found Valerio removable and ineligible for withholding of removal. The IJ determined that Valerio's conviction for aggravated identity theft was a "particularly serious crime" that barred her from obtaining withholding of removal under § 1231(b)(3)(B)(ii). In making this determination, the IJ applied the multi-factor test articulated in Matter of Frentescu, which instructs courts to "look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community."

---

[1]    Valerio later decided not to pursue asylum.

- 5 -

18 I. & N. Dec. at 247. We detail the IJ's application of the Frentescu factors later.

In 2014, the BIA upheld the IJ's decision. In a footnote, the BIA pointed out sua sponte that the IJ had erroneously applied the removal statute (§ 1231) instead of the deportation statute (§ 1253). However, it deemed the error harmless because "[t]he particularly serious crime analysis is the same under both provisions." The BIA opined that the IJ soundly applied the Frentescu criteria in examining Valerio's crime, and went on to address specific arguments that Valerio raised in her appeal. As to Valerio's sentence, the BIA found that it reflected Valerio's "personal situation" rather than an assessment by the sentencing judge that her actions were of lesser seriousness; to the contrary, it found, the circumstances in this case demonstrated the unusually serious nature of Valerio's scheme. As to Valerio's argument that her conviction was for a "nonviolent, victimless crime," the BIA explained that although violence was indeed not at issue here, there were real victims: the subject of the identity theft, whose social security number and identity were stolen, and the government, which was defrauded of at least $176,000. Considering the harm Valerio caused to Hernandez and society as a whole, and commenting that "[i]dentity theft is a serious problem

in our society," the BIA "d[id] not accept [Valerio's] claim that she poses no threat to society or to other individuals."

As said, in 2015, on Valerio's petition for review, a panel of this court remanded the case to the BIA "in an abundance of caution." Velerio-Ramirez, 808 F.3d at 112. The reasons for the remand are stated in that opinion. In 2016, after remand, and without taking additional briefing, the BIA succinctly reaffirmed its prior decision, finding "no change [was] warranted in [its] previous analysis." The BIA explained that § 1253(h)(3), added by § 413(f) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 1269 (1996), "was enacted to offset the expanded definition of aggravated felony [also enacted by the AEDPA] by giving the Attorney General discretionary authority to override the categorical bar that designated every aggravated felony as a particularly serious crime"; § 1253(h)(3) "did not make any significant changes in [the BIA's] interpretation of when a crime that is not an aggravated felony constitutes a particularly serious crime." Post-AEDPA, the BIA's jurisprudence evolved to address "which aggravated felonies are to be considered per se particularly serious crimes and which require a discretionary determination," but in non-aggravated

felony situations, the BIA "continue[d] to exercise [its] discretion, applying the Frentescu analysis."

Valerio moved for reconsideration before the BIA, arguing that the Frentescu test as construed by the BIA does not comply with the 1967 United Nations Protocol Relating to the Status of Refugees, and, in any event, that the IJ and BIA did not properly apply the test. The BIA denied the motion, finding no error of law or fact in its decisions and emphasizing that both the IJ and BIA "fully and properly considered" "[t]he nature and circumstances of [Valerio's] crime."

Valerio petitioned this court to review both the BIA's final order of deportation (No. 16-2272) and its subsequent denial of her motion to reconsider (No. 17-1402). These two petitions were consolidated in June 2017. We now review them together.

## II. Discussion

A.   Jurisdiction

As a threshold matter, the government argues that we lack jurisdiction to review the merits of the BIA's determination that Valerio committed a particularly serious crime. We disagree.

The government relies on 8 U.S.C. § 1252(a)(2)(B)(ii), which states, "[N]o court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General . . . the authority for which is specified under [§§ 1151-1381] to be in the discretion of the Attorney General or the Secretary of Homeland

Security."  But in <u>Kucana</u> v. <u>Holder</u>, the Supreme Court held that § 1252(a)(2)(B) "barred court review of discretionary decisions <u>only</u> when Congress itself set out the Attorney General's discretionary authority in the statute."  558 U.S. 233, 247 (2010) (emphasis added).  Only "decisions specified by statute 'to be in the discretion of the Attorney General' . . . [are] shielded from court oversight."  <u>Id.</u> at 248 (quoting 8 U.S.C. § 1252(a)(2)(B)(ii)).

While <u>Kucana</u> itself involved a question of whether a regulation could trigger the jurisdiction-stripping provisions of § 1252(a)(2)(B), its limitations on the operation of those provisions would appear to be applicable to statutes as well.  One key issue that <u>Kucana</u> did not squarely address, however, is the precise language that Congress must use in order to endow the Attorney General or the Secretary of Homeland Security with discretion over a determination such that the federal courts are deprived of jurisdiction to review that determination under § 1252(a)(2)(B).

With this decision, we side with the majority of other circuits that have held that, under <u>Kucana</u>, a statutory provision must expressly and specifically vest discretion in the Attorney General (for example, by explicitly using the words "in the discretion of the Attorney General") rather than simply leave to the executive branch certain decisions and determinations that

- 9 -

happen to be discretionary in nature.  See Delgado v. Holder, 648 F.3d 1095, 1100 (9th Cir. 2011) (en banc); Berhane v. Holder, 606 F.3d 819, 821-22 (6th Cir. 2010) (noting that "[t]o 'specify' that a decision belongs to the Attorney General's discretion . . . means to 'name or state explicitly or in detail,'" and concluding that merely empowering the Attorney General to make a "determination" or to "decide" an issue does not suffice to trigger the jurisdictional bar); see also Nethagani v. Mukasey, 532 F.3d 150, 154-55 (2d Cir. 2008) ("[W]hen a statute authorizes the Attorney General to make a determination, but lacks additional language specifically rendering that determination to be within his discretion . . . , the decision is not one that is 'specified . . . to be in the discretion of the Attorney General' for purposes of [the jurisdictional bar].") (second alteration in original) (quoting 8 U.S.C. § 1252(a)(2)(B)(ii)); Alaka v. Att'y Gen., 456 F.3d 88, 94-102 (3d Cir. 2006).  But see Estrada-Martinez v. Lynch, 809 F.3d 886, 892 (7th Cir. 2015) (finding the "particularly serious crime" determination unreviewable because it is inherently discretionary).

As the Supreme Court has explained, "[w]hen a statute is 'reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'"  Kucana, 558 U.S. at 251 (quoting Gutierrez de

- 10 -

Martinez v. Lamagno, 515 U.S. 417, 434 (1995)). Thus, if a statute contains no clear statement vesting discretion over a determination with the Attorney General or the Secretary of Homeland Security, § 1252(a)(2)(B)(ii) does not strip the federal courts of jurisdiction to review the applicable determination.

This case involves two distinct statutory provisions. First, § 1253(h)(2)(B) provides that withholding of deportation "shall not apply . . . if the Attorney General determines that . . . the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." (emphasis added). Second, § 1253(h)(3)(B) provides that "[withholding of deportation] shall apply to any alien if the Attorney General determines, in the discretion of the Attorney General, that . . . [withholding] is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." (emphasis added). The government argues that "to the extent" we find the BIA acted pursuant to § 1253(h)(3)(B), we lack jurisdiction to revisit its analysis. That may be true, but we do not reach that question.

As the government itself asserts in its brief, § 1253(h)(3)(B) "had no impact whatsoever on the particularly serious crime determination made in Ms. Valerio's case." The BIA did not determine under § 1253(h)(3)(B) that withholding of deportation was necessary. Rather, it determined under

- 11 -

§ 1253(h)(2)(B) that Valerio committed a particularly serious crime.

We have jurisdiction to review the merits of the BIA's decision because § 1253(h)(2)(B) does not expressly commit the particularly serious crime determination to the Attorney General's discretion. Other circuits agree. See Delgado, 648 F.3d at 1100; Nethagani, 532 F.3d at 154-55; Alaka, 456 F.3d at 94-95. But see Estrada-Martinez, 809 F.3d at 892.[2]

Of course, we also have jurisdiction to address questions of law raised by Valerio's petition. See § 1252(a)(2)(D); Mele v. Lynch, 798 F.3d 30, 32 (1st Cir. 2015). These include what standard governs "particularly serious crime" determinations for non-aggravated felons in deportation proceedings under § 1253(h)(2)(B), and whether the addition of § 1253(h)(3)(B) under the AEDPA has impacted that standard.

B.   Applicable Law

An alien is ineligible for withholding of deportation if "the Attorney General determines that . . . the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States."

---

[2]     We note that, in its request to the Supreme Court to deny certiorari in Estrada-Martinez v. Lynch, the government conceded that § 1252(a)(2)(B)(ii) did not present a jurisdictional bar to federal court review of the "particularly serious crime" determination.

8 U.S.C. § 1253(h)(2)(B).  In its remand order, this court asked the BIA to "articulate the 'particularly serious crime' determination for a non-aggravated felon," and to address whether the enactment of § 413(f) of the AEDPA, codified at § 1253(h)(3)(B), altered that determination.  Velerio-Ramirez, 808 F.3d at 118.  On remand, the BIA explained that it determines on a case-by-case basis whether a non-aggravated felony qualifies as a "particularly serious crime" for the purposes of § 1253(h)(2)(B) by applying the multi-factor test set forth in Matter of Frentescu, and that § 1253(h)(3) did not alter this well-settled analytical framework.[3]  We uphold these conclusions based on the statutory history and our decision in Choeum v. INS, 129 F.3d 29 (1st Cir. 1997).

Section 1253(h)(2)(B) mirrors the language of the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (the "Protocol").  Choeum, 129 F.3d at 41-42.  As neither the

---

[3]    Valerio argues that she was denied due process because the BIA issued its post-remand decision without first providing her an opportunity to brief the question posed by the First Circuit in its remand order.  This procedural plaint lacks merit.  Valerio knew of the remand, but she did not request that the BIA provide her an opportunity to submit a post-remand brief.  Regardless, the regulation governing briefing before the BIA makes no mention of a duty to solicit briefing following a remand.  See 8 C.F.R. § 1003.3(c).  While the BIA's Practice Manual does contemplate that the BIA will set a briefing schedule on remand "in appropriate cases," § 4.19(d), the Manual is "strictly informational in nature," Preface, and "does not carry the weight of law or regulation," § 1.1(c).

Protocol nor § 1253(h)(2)(B) defines "particularly serious crime," the BIA articulated in Matter of Frentescu a multi-factor test for determining on a case-by-case basis which crimes qualify as particularly serious. See 18 I. & N. Dec. 244, 247 (B.I.A. 1982). The BIA later held that an alien who has committed a particularly serious crime necessarily represents a danger to the community; no separate dangerousness determination is required under § 1253(h)(2)(B). Matter of Carballe, 19 I. & N. Dec. 357, 360 (B.I.A. 1986). "All circuits that have addressed the issue . . . have upheld this interpretation." Velerio-Ramirez, 808 F.3d at 115 n.7; see also Choeum, 129 F.3d at 41 ("This court, while acknowledging that there is 'considerable logical force' to the argument that the Particularly Serious Crime Exception requires a separate determination of dangerousness to the community, has upheld the agency's interpretation under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)." (citations omitted)).

In 1990, Congress amended § 1253(h)(2) to categorically designate aggravated felonies as particularly serious crimes. See Matter of C-, 20 I. & N. Dec. 529, 534-35 & n.3 (B.I.A. 1992). The BIA accordingly dispensed with the Frentescu case-by-case inquiry in aggravated felony cases, but retained it for non-aggravated felonies. See id. at 535 n.3; see also Mosquera-Perez v. INS, 3 F.3d 553, 559 (1st Cir. 1993) ("[I]t is reasonable to

- 14 -

infer that Congress intended the 1990 amendment to equate aggravated felonies with 'danger to the community,' obviating a redundant Frentescu inquiry in cases involving aggravated felonies."). Congress again amended § 1253(h)(2) when it enacted the AEDPA. The AEDPA expanded the statutory definition of aggravated felonies, see Pub. L. No. 104-132, § 440(e), 110 Stat. 1214, 1269 (1996), but also gave the Attorney General discretionary authority, "[n]otwithstanding any other provision of law," to withhold deportation whenever "necessary to ensure compliance with the [Protocol]." Id. § 413(f).

In Choeum, this court thoroughly considered the significance of § 1253(h)(3) for the "particularly serious crime" test articulated in Frentescu and its progeny. The petitioner in Choeum argued that it expressed congressional intent to reject the BIA's interpretation that the Protocol and § 1253(h)(2)(B) do not require a standalone inquiry into an alien's dangerousness. 129 F. 3d at 41. This court rejected that argument. See id. at 43. Instead, it deferred to the BIA's interpretation: § 1253(h)(3) was intended to offset the AEDPA's expansion of the definition of aggravated felonies, by "preserv[ing] the Attorney General's flexibility in assessing whether crimes now defined as aggravated felonies were, in fact, 'particularly serious' within the meaning of the Protocol." Choeum, 129 F.3d at 42-43. Choeum involved an aggravated felony, but this court's conclusion that the AEDPA did

not alter the BIA's test for case-specific "particularly serious crime" determinations is dispositive for aggravated and non-aggravated felonies alike.

In conclusion, the BIA's determination that Matter of Frentescu supplies the standard for determining whether a non-aggravated felony qualifies as a "particularly serious crime" rendering an alien ineligible for withholding of deportation is sound. The Frentescu framework includes an inquiry into "whether the type and circumstances of the crime indicate the alien is a danger to the community," 18 I. & N. Dec. at 247; no separate dangerousness assessment is required, Carballe, 19 I. & N. Dec. at 360.[4]

C.   Merits of the "Particularly Serious Crime" Finding

Where, as here, "the BIA adopted and affirmed the IJ's ruling but also discussed some of the bases for the IJ's opinion, we review both the IJ's and BIA's opinions."   Weng v. Holder,

---

[4]   We acknowledge that Valerio and the amici have marshalled evidence in support of their claim that the BIA has been misinterpreting the Protocol and § 1253(h)(2)(B) ever since it decided in Matter of Carballe that no separate assessment of dangerousness is necessary.   However, we cannot resuscitate a debate that has been thoroughly litigated in almost all circuits, unanimously resolved in the BIA's favor, and twice put to rest by this court.   See Mosquera-Perez, 3 F.3d at 559; Choeum, 129 F.3d at 43; Velerio-Ramirez, 808 F.3d at 115 n.7; see also N-A-M v. Holder, 587 F.3d 1052, 1057 (10th Cir. 2009)("Although [petitioner] and the distinguished amici make strong arguments that the BIA is not accurately interpreting the statute and its treaty-based under-pinnings, we are constrained by our precedent to hold otherwise.").

593 F.3d 66, 71 (1st Cir. 2010) (internal quotation marks omitted) (quoting Cuko v. Mukasey, 522 F.3d 32, 37 (1st Cir. 2008)). We review for abuse of discretion the BIA's assessment and weighing of the Frentescu factors, including its conclusion that the crime of conviction was "particularly serious." See Arbid v. Holder, 700 F.3d 379, 385 (9th Cir. 2012); Gao v. Holder, 595 F.3d 549, 557 (4th Cir. 2010). Under this deferential standard, we will uphold the determination "unless it was made 'without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Choeum, 129 F.3d at 44 (quoting Hazzard v. INS, 951 F.2d 435, 438 (1st Cir. 1991)); see also Gao, 595 F.3d at 557 ("Appellate courts should not lightly reverse for abuse of discretion in cases where, as here, lower tribunals weigh various factors under a totality-of-the-circumstances test."). We also review legal questions de novo, while affording deference to the BIA's interpretations of the statutes and regulations it administers. See Costa v. Holder, 733 F.3d 13, 16 (1st Cir. 2013).

Valerio argues that the BIA erred as a matter of law because, she says, it completely failed to examine several of the Frentescu factors. Specifically, she alleges the BIA ignored her sentence, disregarded the underlying facts and circumstances of her conviction, and did not make any finding whatsoever as to whether the type and circumstances of her crime indicate she is a

- 17 -

danger to the community.  She argues that it would be legal error for the BIA, while purporting to perform the case-specific inquiry prescribed by Matter of Frentescu, to fail to conduct an individualized analysis of the alien's crime.  See Afridi v. Gonzales, 442 F.3d 1212, 1219, 1221 (9th Cir. 2006) (BIA acted arbitrarily and capriciously because it "did not consider the circumstances and underlying facts of the conviction" and thus "failed to engage in a case-specific analysis"), overruled on other grounds by Estrada-Espinoza v. Mukasey, 546 F.3d 1147, 1160 n.15 (9th Cir. 2008) (en banc); Yousefi v. INS, 260 F.3d 318, 329-30 (4th Cir. 2001) (IJ's and BIA's "complete failure . . . to consider key Frentescu factors" -- "specifically, the circumstances and underlying facts of the conviction and whether the circumstances of the crime indicate that [petitioner] would be a danger to the community" -- was arbitrary and capricious).  However, as detailed below, the record in this case shows the IJ and BIA did conduct an individualized analysis of Valerio's crime, properly guided by the Frentescu factors.  We also find that in performing its analysis, the BIA did not abuse its discretion.

First, Valerio contends that the BIA failed to perform an "individualized, case-specific analysis" of the circumstances and facts of Valerio's identity theft conviction, instead making "what amounted to a per se determination that aggravated identity theft is particularly serious."  The record flatly contradicts her

claim. After finding generally that the elements of "aggravated identity theft" bring it "within the ambit of particularly serious crimes," the IJ evaluated Valerio's offense. The IJ took into consideration Valerio's state of mind ("[Valerio] did not merely make up a Social Security number at random . . . , rather she knowingly stole the identity of a real person"); the multiple illicit uses she made of Hernandez's identity beyond merely securing employment ("to take out a loan, purchase a home, purchase two cars, [and] open numerous lines of credit" as well as "to defraud the government of . . . welfare benefits"); the duration of the scheme ("more than a decade"); the sentence imposed ("twenty four months," a "significant length of time" reflecting the crime's "serious nature"); and the "substantial sum" she was ordered to pay in restitution (over $176,000). The IJ emphasized the "pervasive and comprehensive nature" of Valerio's fraudulent stratagem, which involved maintaining separate bank accounts and residences so as to withhold the income she earned and assets she held under Hernandez's name when applying for government aid under her real name; separately storing two sets of identity documents; impersonating Hernandez to vouch for herself in welfare benefit applications; and even submitting false "corrections" to the residential history and student loan debt information in Hernandez's credit reports. The IJ concluded from this fact-intensive inquiry that Valerio's scheme was "complex in nature,

lasting more than a decade, and extended well beyond securing the bare necessities for her family's welfare."  In light of this analysis, the BIA soundly concluded that the "nature and circumstances of [Valerio's] crime were fully and properly considered."

Valerio retorts that the bulk of the BIA's individualized analysis pertained to her three mail fraud convictions, not her identity theft.  She claims the particularly serious crime analysis must focus on a single conviction, and argues that the BIA erred as a matter of law when it considered the circumstances of her mail fraud conviction.  The argument relies on a mistaken reading of a concurrence in Delgado, 648 F.3d at 1112 (Reinhardt, J., concurring) ("The singular article 'a' could not make any clearer the singular nature of 'a particularly serious crime': the agency must identify one offense of conviction that constitutes a particularly serious crime.").  The premise of Valerio's argument is wrong.  Valerio was convicted of aggravated identity theft, that is, identity theft performed "during and in relation to" another felony.  See 18 U.S.C. § 1028A(a)(1).  As the IJ emphasized, "to be charged with aggravated identity theft, the perpetrator must have committed multiple criminal acts, all of which involve fraud, deception, and the potential for serious economic harm to the victim."  When the crime of conviction has as an element the commission of another crime, the "particularly

- 20 -

serious crime" analysis should take into account the facts and circumstances of that other crime. Here, because mail fraud was a component of the aggravated identity theft offense under consideration, it necessarily bears upon that offense's seriousness. Thus, it was entirely proper for the BIA to consider Valerio's mail-fraud offenses in assessing the seriousness of her aggravated identity theft conviction.

Second, Valerio contends that the BIA failed to consider relevant sentencing information -- specifically, the fact she received no more than a mandatory minimum sentence. Again, the record shows otherwise. As the BIA noted approvingly, the IJ acknowledged the sentencing judge's basis for imposing a mandatory minimum sentence -- Valerio's "age, the fact that she had three minor children, and her mental and emotional state" -- but found such "personal circumstances" unpersuasive because they did not diminish the gravity of her crime. See Matter of N-A-M-, 24 I. & N. Dec. at 343. Considering and rejecting Valerio's argument that her sentence "reflects the low level of seriousness of her offense," the IJ reasoned that "twenty four months is a significant length of time and reflects the serious nature of aggravated identity theft." There was no abuse of discretion in the IJ and BIA's assessment of Valerio's sentence.

Third, Valerio contends that the BIA failed to consider whether the type and circumstances of her crime indicate she is a

- 21 -

danger to the community. Not so. The IJ conducted a detailed inquiry into the circumstances of Valerio's crime, highlighting how it "resulted in long-term harm, both to the victim, Rosa Hernandez, as well as to society in general." The BIA endorsed the IJ's findings and concluded Valerio was a threat to other individuals and society in general:

> We agree with the Immigration Judge that [Valerio] inflicted harm on the subject of her identity theft, as well as defrauding various institutions of at least $176,000. [Valerio's] claim that there is no harm here is not persuasive. This is not potential harm . . . . This is actual harm. For similar reasons, we, like the Immigration Judge, do not accept the respondent's claim that she poses no threat to society or to other individuals.

On remand, the BIA further emphasized how identity theft "can cause severe detriment to its victims and is a danger to the community," and that in this particular case, Valerio "engaged in fraud on many occasions for over 10 years." The seriousness of Valerio's fraudulent scheme, evidenced by its complexity, duration, and the significant harm caused, supported a finding that Valerio posed a threat to the community.

Valerio contends that, even if we find the BIA engaged in a case-specific analysis guided by the Frentescu factors, the BIA nonetheless erred in reaching its ultimate conclusion that her aggravated identity theft was a particularly serious crime. She makes two arguments: first, that as a matter of law only violent

offenses can qualify as particularly serious crimes, and second, that in the rare instances crimes not involving violence or a threat of bodily injury have been deemed particularly serious, the offenses were "significantly more heinous" and caused more "extensive financial harm" than Valerio did here.

Neither the Protocol nor § 1253(h)(2)(B) defines the phrase "particularly serious crime." Nor do they set any bright-line limitations on the types of offenses that may qualify as particularly serious. The BIA has reasonably concluded that "while an offense is more likely to be considered particularly serious if it is against a person," the offense need not necessarily involve violence in order to qualify. See Matter of R-A-M-, 25 I. & N. Dec. 657, 662 (B.I.A. 2012). Indeed, on a number of occasions, circuit courts have upheld BIA decisions finding non-violent crimes "particularly serious." See, e.g., Arbid, 700 F.3d at 385 (mail fraud of nearly $2 million); Kaplun v. Att'y Gen., 602 F.3d 260, 267-68 (3d Cir. 2011) (securities fraud of nearly $900,000); Hakim v. Holder, 628 F.3d 151, 152, 154 (5th Cir. 2010) (money laundering of over $50,000). The IJ reasonably concluded that because, as a general matter, aggravated identity theft can involve "extensive schemes of deception" and have "devastating effects on

the victims of identity theft and society as a whole," it falls within the ambit of particularly serious crimes.

Nor can we say that the IJ's and BIA's "particularly serious crime" determination on the facts of this case was made "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Choeum, 129 F.3d at 44 (quoting Hazzard, 951 F.2d at 438). The IJ highlighted the similarities between Valerio's crime and the mail fraud deemed particularly serious in Arbid. In upholding the BIA's conclusion in Arbid, the Ninth Circuit emphasized the petitioner's "substantial" sixteen-month term of imprisonment, the imposition of a $650,000 restitution order, the petitioner's apparent lack of remorse, and the complex nature of the petitioner's scheme. Arbid, 700 F.3d at 385. Here, Valerio was subject to a two-year term of imprisonment as well as a restitution order of over $170,000, and, as the IJ described in some detail, Valerio engaged in an unusually "complex," "comprehensive," and "long-term" scheme. Contrary to Valerio's representations in her petition, it is clear that hers was not a garden-variety identity theft. Many aggravating circumstances undergird and cabin the BIA's ruling: the extended duration of the identity theft and related fraud, its far-reaching scope, its complexity, and the substantial amounts involved. We

find the BIA did not abuse its discretion when it concluded that Valerio committed a particularly serious crime.

## III. Conclusion

For these reasons, Valerio's petitions for review are denied.