SHWARTZ, Circuit Judge.
*258 Today we decide whether the phrase "particularly serious crime" as used in both the asylum and withholding of removal statutes, 8 U.S.C. §§ 1158(b)(2), 1231(b)(3), includes, but is not limited to, aggravated felonies. We hold that it does. The phrase "particularly serious crime" means the same thing in both statutes, and the language of those statutes shows that aggravated felonies are a subset of particularly serious crimes.
In reaching this conclusion, we overrule Alaka v. Attorney General, 456 F.3d 88 (3d Cir. 2006), where we defined the phrase "particularly serious crime" in the context of withholding of removal to include only aggravated felonies. Because we revisit this precedent and agree with the Board of Immigration Appeals' ("BIA") decision that Petitioner Carlos Eduardo Bastardo-Vale committed a particularly serious crime that barred him from obtaining asylum and withholding of removal relief, we will deny the petition for review.
I
Bastardo-Vale petitions for review of the BIA decision that his conviction for second-degree unlawful imprisonment under Delaware law constitutes a "particularly serious crime," rendering him ineligible for both asylum and withholding of removal relief. 8 U.S.C. §§ 1158(b)(2), 1231(b)(3). His state conviction arose from a forcible sexual encounter with a college freshman ("victim"). At the time of the incident, Bastardo-Vale, a native and citizen of Venezuela who entered the United States on a nonimmigrant student visa, was a graduate resident assistant at Goldey-Beacom College.
In the early morning of November 10, 2013, Bastardo-Vale returned to his apartment. There, by the victim's account, Bastardo-Vale invited her to his apartment where he forcibly pulled her into his room and began raping her, or by Bastardo-Vale's account, they began to have consensual sex. According to the police report, the victim told Bastardo-Vale to " 'stop' numerous times but he refused." A.R. 2187. She "freed herself by using her knee to strike [Bastardo-Vale] in the rib cage and push him off of her body." Id. The victim and Bastardo-Vale both left the apartment. About forty-five minutes later, Bastardo-Vale encountered security guards elsewhere on campus, who told him that they were looking for him because he had been accused of rape and instructed him to "stay." A.R. 260. Bastardo-Vale ignored their direction, returned to his apartment to retrieve a used condom, and tossed it into a dumpster. He claimed that he discarded the evidence because, as a graduate resident assistant, he risked losing his scholarship by having sexual relations with a freshman.
Bastardo-Vale pleaded no contest to second-degree unlawful imprisonment in violation of Del. Code Ann. tit. 11, § 781 and was sentenced to the maximum term of one year's imprisonment, which was suspended for eleven months of time served.
The Department of Homeland Security ("DHS") then charged Bastardo-Vale with removability under *259 8 U.S.C. § 1227(a)(2)(A)(i), for being convicted of a crime involving moral turpitude, and under 8 U.S.C. § 1227(a)(1)(C)(i), for failing to comply with the conditions of his nonimmigrant status. The Immigration Judge ("IJ") found Bastardo-Vale was removable because he had stopped attending college and thus failed to comply with the "conditions of his admission to nonimmigrant student status." A.R. 197. Bastardo-Vale applied for asylum, withholding of removal, and Convention Against Torture ("CAT") relief based primarily on his claim that he was harmed in his country of origin on account of an imputed political opinion stemming from his mother's political activities. DHS argued that Bastardo-Vale was not entitled to asylum and withholding of removal because he had been convicted of a particularly serious crime and was a "danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(3)(B)(ii). The IJ rejected that argument and instead of applying Alaka, which limited the phrase "particularly serious crime" to aggravated felonies, it relied on In re N-A-M-, 24 I. & N. Dec. 336 (BIA 2007), aff'd per curiam, 587 F.3d 1052 (10th Cir. 2009). Applying N-A-M-, the IJ determined that Bastardo-Vale's conviction was not for a particularly serious crime because (1) it "was based on a plea agreement pursuant to which [he] pled no contest," A.R. 203; (2) there was no evidence suggesting he used "physical force to confine the victim in his apartment," A.R. 204, and (3) he "received a sentence of one year, all of which was suspended for time served ... [which] suggest[s] that the criminal court did not consider him a danger to the community," A.R. 204. The IJ noted that Bastardo-Vale's attempt to dispose of evidence was "very troubling" but insufficient to make his crime a particularly serious offense. A.R. 204. The IJ therefore found that he was eligible for asylum and had no need to consider his request for withholding of removal or CAT relief. DHS appealed the IJ's finding that Bastardo-Vale's conviction was not for a particularly serious crime.
The BIA agreed with DHS, disregarded our precedent in Alaka, and held that Bastardo-Vale had "been convicted of a particularly serious crime under [the BIA's] case-by-case approach set forth in," among other cases, N-A-M-. A.R. 6. The BIA concluded that the Delaware unlawful imprisonment statute encompasses conduct involving physical force and intimidation, as well as that which "places at risk a particularly vulnerable segment of society ... [so the] conviction falls within the potential ambit of a particularly serious crime." A.R. 6. The BIA concluded the circumstances of Bastardo-Vale's offense demonstrated its seriousness because "[t]he use of physical force to overcome another's desire to terminate a sexual encounter, whether originally consented to or not, is an inherently violent act that places a victim in fear for their safety." A.R. 6-7. The BIA held that Bastardo-Vale's conviction for a particularly serious crime barred him from receiving asylum and withholding of removal but remanded the matter to the IJ to address whether he was entitled to CAT relief.[1]
*260 On remand, Bastardo-Vale withdrew his CAT claim, and the IJ ordered Bastardo-Vale removed. Bastardo-Vale appealed the IJ's decision to the BIA for it to certify the ruling as final and petitioned our Court for review.[2] The BIA determined that "there [was] nothing left for [it] to decide regarding" Bastardo-Vale's asylum or withholding of removal applications, Supp. App. 10, but again remanded the matter for the IJ to determine his country of removal. The IJ subsequently ordered Bastardo-Vale removed to Venezuela.
Bastardo-Vale seeks review of the BIA's determination that his conviction for second-degree *261 unlawful imprisonment qualifies as a particularly serious crime and asserts that he is entitled to asylum and withholding of removal. He claims that the BIA erred in disregarding Alaka and holding that his nonaggravated offense was a "particularly serious crime" that bars him from relief.
After oral argument before a panel of our Court, we elected sua sponte to hear the case en banc to determine whether Alaka remains good law. We now examine the phrase "particularly serious crime" under both the asylum and withholding of removal statutes as well as the rulings of our sister circuits who have concluded that the phrase "particularly serious crime" is not limited to aggravated felonies in either the asylum or withholding of removal context.
II[3]
A
The IJ granted Bastardo-Vale asylum but the BIA overturned that ruling because it found that Bastardo-Vale was convicted of an offense it deemed to be a particularly serious crime, even though it was not an aggravated felony. To determine whether this is correct, we will first review the statutory framework for asylum.
The Secretary of Homeland Security or the Attorney General may grant an asylum application if the alien shows that he is a "refugee" who is persecuted due to his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1158(b)(1)(B)(i). Asylum, however, is unavailable to an alien, "convicted by a final judgment of a particularly serious crime," whom the Attorney General determines "constitutes a danger to the community of the United States." Id. § 1158(b)(2)(A)(ii).
The phrase "particularly serious crime" is not defined in § 1158, but Congress included two "Special Rules" within the asylum statute addressing the subject. Id.
§ 1158(b)(2)(B). The Special Rules provide:
(i) Conviction of aggravated felony
For purposes of clause (ii) of subparagraph (A) [which bars an alien convicted of a particularly serious crime from asylum relief], an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.
(ii) Offenses
The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) ... of subparagraph (A).
Id. While the language in subsection (i) automatically designates aggravated felonies as particularly serious crimes, subsection (ii) shows that Congress did not limit the definition of particularly serious crimes to aggravated felonies. Indeed, the asylum statute authorizes the Attorney General to designate by regulation other offenses as particularly serious crimes. Id. § 1158(b)(2)(B)(ii). To say that the statute limits the types of offenses that could be considered particularly serious to aggravated felonies would render superfluous the Attorney General's power to designate offenses as particularly serious crimes by regulation. Gao v. Holder, 595 F.3d 549, 556 (4th Cir. 2010). Our reading ensures that we "give effect to every word" of the *262 statute. Leocal v. Ashcroft, 543 U.S. 1, 12, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (citation omitted).
Moreover, reading "particularly serious crime" to include only aggravated felonies would improperly render the phrase meaningless as it would just be an alternate phrase for "aggravated felony." See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks and citation omitted)). Reading the plain language of the asylum statute to provide that aggravated felonies are just one category of crimes that are deemed particularly serious would give the phrases "particularly serious crime" and "aggravated felony" independent meaning.
Such a reading would also render meaningless the Attorney General's power to designate other crimes as serious. See Delgado v. Holder, 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc) ("There is little question that this latter provision permits the Attorney General, by regulation, to make particular crimes categorically particularly serious even though they are not aggravated felonies." (emphasis omitted)); Gao, 595 F.3d at 556 ("Given that the statute makes all aggravated felonies per se particularly serious, the Attorney General's power to designate offenses as such by regulation would be 'wholly redundant' if it were limited to aggravated felonies." (citation omitted)); Nethagani v. Mukasey, 532 F.3d 150, 156 (2d Cir. 2008) ("The Attorney General (or his agents) may determine that a crime is particularly serious for purposes of the asylum statute, 8 U.S.C. § 1158(b)(2)(B)(i), even though it is not an aggravated felony."); Ali v. Achim, 468 F.3d 462, 469 (7th Cir. 2006) ("Nowhere does § 1158 purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is 'particularly serious' unless he had the foresight to explicitly itemize that particular crime by regulation.").
Congress's grant of authority to the Attorney General to promulgate regulations to identify other offenses as particularly serious crimes further demonstrates that offenses other than aggravated felonies could be designated as per se particularly serious crimes. Through rulemaking, the Attorney General gives notice to the public of offenses, in addition to aggravated felonies, that may be designated as per se "particularly serious crimes" and receives comments. This authorization, however, is permissive and does not preclude the Attorney General from evaluating, on a case-by-case basis, whether the facts and circumstances of a conviction also support concluding that an individual alien committed a particularly serious crime. Immigration officials have proceeded via case-by-case adjudication since the early 1980s. See Delgado, 648 F.3d at 1106 (citing In re Frentescu, 18 I. & N. Dec. 244, 247 (1982) ). We presume that Congress was aware of this procedure in 1996 when it granted the Attorney General the authority to identify by regulation categories of crimes that may be deemed per se particularly serious crimes. See id. ("Although Congress has amended the asylum statute's particularly serious crime bar over time, none of its actions have called into question the BIA's authority to designate offenses as particularly serious crimes through case-by-case adjudication."); see also Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Thus, the grant of regulatory *263 authority to designate classes of offenses as particularly serious crimes did not displace the Attorney General's authority to also make case-specific determinations concerning whether an alien's offense should be deemed "particularly serious."[4] See Delgado, 648 F.3d at 1106 (holding that § 1158(b)(2)(B) "does not require the *264 Attorney General to anticipate every adjudication by promulgating a regulation covering each particular crime"); Gao, 595 F.3d at 556 (rejecting the view that "regulation is the exclusive means by which the Attorney General can determine that a non-aggravated felony is a particularly serious crime" because, among other things, "requiring an agency to proceed by rulemaking alone could stultify the administrative process by rendering it inflexible and incapable of dealing with many of the specialized problems which arise" (internal citation and quotation marks omitted)); Ali, 468 F.3d at 469 (noting that "[a]n interpretation that requires the Attorney General and his agents to sift through each state's code and prospectively identify by regulation every single crime that would qualify as 'particularly serious' would impose an onerous burden," and that "[n]othing in the statute's text suggests a requirement that the Attorney General must engage in such an anticipatory task").[5]
For these reasons, we hold that under the asylum statute, (1) aggravated felonies *265 are a subset of offenses that constitute particularly serious crimes; (2) the Attorney General has the authority to designate other offenses as per se particularly serious; and (3) the Attorney General retains the authority, through a case-by-case evaluation of the facts surrounding an individual alien's specific offense, to deem that alien to have committed a particularly serious crime.
B
We next examine the phrase "particularly serious crime" in the withholding of removal statute to determine whether it also includes, but is not limited to, aggravated felonies. The "particularly serious crime" bar in that statute provides:
Subparagraph (A) [providing for withholding of removal] does not apply to an alien deportable under section 1227(a)(4)(D) of this title or if the Attorney General decides that-
...
(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;
...
For the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.
8 U.S.C. § 1231(b)(3)(B).
In Alaka, we interpreted the phrase "particularly serious crime" as used in the withholding statute to be limited to aggravated felonies. 456 F.3d at 104-05. The Alaka court examined only the withholding statute, and no party presented the Alaka court with the identical phrase from the asylum statute. Thus, the Alaka court was not required to consider whether the use of the phrase in the asylum statute should influence its interpretation of the identical phrase in the withholding statute. Unlike our colleagues in Alaka, we must interpret the phrase as used in both statutes because Bastardo-Vale seeks both asylum and withholding of removal relief. We must therefore proceed in this case mindful that "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." Cochise Consultancy, Inc. v. United States ex rel. Hunt, --- U.S. ----, 139 S. Ct. 1507, 1512, 203 L.Ed.2d 791 (2019) (citation omitted); Smith v. City of Jackson, 544 U.S. 228, 233, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes ... it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). As a result, we will reexamine our earlier interpretation of the phrase "particularly serious crime" as it is used in the withholding of removal statute.
*266 As we already stated, the phrase "particularly serious crime" as used in the asylum statute includes but is not limited to aggravated felonies. Examining the identical phrase in the withholding of removal statute, we reach the same conclusion. The withholding of removal statute specifically lists a subset of aggravated felonies deemed per se "particularly serious crimes." The statute provides that "an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime." 8 U.S.C. § 1231(b)(3)(B). Through this language, Congress designated a category of aggravated felonies based upon the punishment imposed to be a particularly serious crime. In the very next sentence, Congress expressly stated that its directive concerning aliens convicted of aggravated felonies and sentenced to five or more years' imprisonment did not "preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." Id. The language embodies Congress's explicit statement that the Attorney General had the continuing authority to determine whether a crime is particularly serious. This demonstrates that Congress did not disturb the Attorney General's prior practice of deciding, on a case-by-case basis, whether an alien's crime was particularly serious. See N-A-M v. Holder, 587 F.3d 1052, 1056 (10th Cir. 2009) (observing that the "long history of case-by-case determination" of particularly serious crimes "counsels against ... a bright-line rule" for determining which crimes are particularly serious (citations omitted)). Indeed, the language of § 1231(b)(3)(B) is permissive, not restrictive, in that it does not explicitly dictate that the only offenses that constitute particularly serious crimes are aggravated felonies. See Delgado, 648 F.3d at 1104 ; Gao, 595 F.3d at 555 ; N-A-M, 587 F.3d at 1056.
Moreover, Congress used both "aggravated felony" and "particularly serious crimes" in the statute and, as stated earlier, we are obligated to give each word meaning. See N-A-M, 587 F.3d at 1056 (holding that "Congress's use of two different terms-'particularly serious' crime and 'aggravated' felony-is additionally indicative of substantively different meanings"). To say that only aggravated felonies are "particularly serious crimes" would render the words "particularly serious crime" surplusage. Put differently, if Congress did not intend for crimes other than aggravated felonies to disqualify aliens from withholding of removal, then it would have simply said that (1) an alien convicted of an aggravated felony and sentenced to at least five years of imprisonment is barred from relief and that (2) the Attorney General may, in his discretion, bar those who are convicted of an aggravated felony and who received sentences of less than five years from relief. Congress's inclusion of the words "particularly serious crime" in addition to the words "aggravated felony" conveys that the bar may apply to those who are convicted of crimes other than aggravated felonies too when the Attorney General determines the offense is a particularly serious crime.
In sum, the language of the withholding of removal statute shows that aggravated felonies are a subset of particularly serious crimes and that Congress has deemed one subset of aggravated felonies, namely those for which the alien was sentenced to at least five years, particularly serious per se. Our sister circuits have also embraced the view that the phrase "particularly serious crime" as used in the withholding of removal statute includes but is not limited to aggravated felonies. See *267 Delgado, 648 F.3d at 1102-04 ; Gao, 595 F.3d at 554-55 ; N-A-M, 587 F.3d at 1056 ; Nethagani, 532 F.3d at 156-57 ; see also Valerio-Ramirez v. Sessions, 882 F.3d 289, 296 (1st Cir. 2018) (adopting a case-by-case approach for determining "whether a non-aggravated felony qualifies as a particularly serious crime rendering an alien ineligible for withholding of deportation" (internal quotation marks omitted)). Thus, under the language of both the asylum and withholding statutes, the phrase "particularly serious crime" means the same thing: both aggravated felonies and other offenses can be particularly serious crimes.[6]
In reaching this conclusion, we depart from our precedent in Alaka. In our Court, precedent is binding on later panels, 3d Cir. I.O.P. 9.1, and "[w]e do not overturn our precedents lightly," Al-Sharif v. U.S. Citizenship & Immigration Servs., 734 F.3d 207, 212 (3d Cir. 2013) (en banc). Indeed, this practice shows our Court's respect for the role of stare decisis and the predictability it affords. See Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (noting that stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process" (citation omitted)). This case, however, presents a "rare occasion" where departure is required for four reasons. See In re Grossman's Inc., 607 F.3d 114, 117 (3d Cir. 2010) (en banc). First, in the twelve years since Alaka, no other appellate court tasked with interpreting the phrase "particularly serious crime" has concluded that it only includes aggravated felonies. While we generally "decide cases before us based on our own examination of the issue, not on the views of other jurisdictions," these more recent decisions suggest that we should "consider whether the reasoning applied by our colleagues elsewhere is persuasive." Id. at 121 ; Joyce v. Maersk Line Ltd, 876 F.3d 502, 512 (3d Cir. 2017) (en banc) ("[W]hen our Court is in disagreement with every other circuit to consider a question, it can be wise to reconsider our prior reasoning."). Second, the phrase "particularly serious crime" is used in both the asylum and withholding of removal statutes and should be interpreted to mean the same thing. See, e.g., City of Jackson, 544 U.S. at 233, 125 S.Ct. 1536. Third, by interpreting the phrase consistently across similar statutes, and similar to our sister circuits, we ensure that aliens in different circuits with identical convictions are treated similarly. Finally, as explained above, limiting the phrase "particularly serious crimes" to encompass only aggravated felonies "cannot easily be reconciled with the text" of the asylum and withholding of removal statutes. See Al-Sharif, 734 F.3d at 212. Therefore, we now overrule Alaka's definition of particularly serious crime as being limited to aggravated felonies and hold that the phrase "particularly serious crime" includes-but is not limited to-aggravated felonies.
III
Having determined that the phrase "particularly serious crime" can include offenses other than aggravated felonies, we now address the Government's argument that Bastardo-Vale waived his right to challenge the BIA's application of N-A-M- to his conviction.
*268 "[A]n appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal." Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist., 877 F.3d 136, 145 (3d Cir. 2017). If an argument on appeal is not "supported specifically by 'the reasons for [it], with citations to the authorities and parts of the record on which the appellant relies,' " it is not properly preserved. Id. (quoting Fed. R. App. P. 28(a)(8)(A) ). We typically decline to address arguments not properly preserved in the "original briefs" to us. See Daggett v. Kimmelman, 811 F.2d 793, 795 n.1 (3d Cir. 1987).
Bastardo-Vale failed to argue in his opening brief to us that the BIA improperly applied N-A-M- in concluding that his conviction for second-degree unlawful imprisonment was a particularly serious crime. Instead, Bastardo-Vale argued only that, because he was not convicted of an aggravated felony, the particularly serious crime bar did not apply to his claims for asylum and withholding of removal. Bastardo-Vale's clear focus on Alaka in his brief to our Court and his omission of any argument regarding the BIA's application of N-A-M- and its analysis of the circumstances of his offense constitutes a waiver of any challenges to the BIA's assessment of whether his offense of conviction constitutes a particularly serious crime. Thus, we will leave the BIA's conclusion undisturbed.[7]
IV
For the foregoing reasons, we will deny the petition.

In reaching this conclusion, the BIA did not cite and in fact did not follow Alaka. Rather, it relied upon its own decision in In re M-H-, 26 I. & N. Dec. 46 (BIA 2012), where it held that, under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and National Cable & Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005), it had the authority to apply its own interpretation. The BIA in M-H-, in turn, reasoned that (1) Alaka did not hold that 8 U.S.C. § 1231(b)(3)(B) was unambiguous, M-H-, 26 I. & N. Dec. at 49, (2) applying its own precedent to matters arising in the Third Circuit would "promote national uniformity in the application of the particularly serious crime bar for withholding of removal," id., and (3) using its own precedent would "provide consistency in the treatment of the particularly serious crime bars for [both] asylum and withholding of removal" cases, id. at 49-50.
The IJ and BIA's blatant disregard of the binding regional precedent is ultra vires. See Abdulai v. Ashcroft, 239 F.3d 542, 553 (3d Cir. 2001) ("The BIA is required to follow court of appeals precedent within the geographical confines of the relevant circuit." (citation omitted)). While we understand the value of uniform treatment of similarly situated aliens and acknowledge that, until now, our circuit precedent differed from that of other circuits, Brand X did not provide the IJ or BIA the authority to ignore the applicable regional circuit's precedent. See Abdulai, 239 F.3d at 553 ; Saravia v. Att'y Gen., 905 F.3d 729, 731 (3d Cir. 2018) (holding that an IJ must follow circuit precedent despite the BIA's "subsequent contrary decision" (citation omitted)). To the contrary, Brand X provides that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference ... if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 545 U.S. at 982, 125 S.Ct. 2688.
In Alaka, we did not hold that the phrase "particularly serious crime" in the withholding of removal statute was ambiguous. Thus, the case on which the BIA and IJ relied, M-H-, misunderstood Alaka's view of the statutory phrase. M-H- reasoned that since Alaka did not expressly state that the withholding statute was "unambiguous," the agency was free to disregard our interpretation of the statute and impose its own. 26 I. & N. Dec. at 49. There are two related problems with this view. First, Alaka stated that the "plain language and structure" of the withholding statute "indicate[d] that an offense must be an aggravated felony" to be particularly serious. 456 F.3d at 104. This demonstrated that the Alaka court did not view the withholding statute as ambiguous. Second, the absence of Chevron -type language from Alaka, such as an explicit statement that the statute was unambiguous, is understandable because the BIA had not interpreted the clause at issue when the Alaka court ruled. Thus, the Alaka court had no reason to use language relevant to deciding whether we are obligated to defer to an agency's interpretation. The lack of magic words like "unambiguous" and use of words like "suggest" or "implies," when viewed in context of Alaka's focus on the statute's language and structure, conveys that it viewed the statute as clear. See Texas v. Alabama-Coushatta Tribe of Texas, 918 F.3d 440, 447 (5th Cir. 2019) (holding that a "prior judicial decision need not say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency" (internal quotation marks and citations omitted)). Because the BIA's interpretation of Alaka is predicated on an erroneous view that Alaka did not hold that the statute was unambiguous, we need not defer to its interpretation. Compare M-H-, 26 I. & N. Dec. at 49, with Alabama-Coushatta Tribe, 918 F.3d at 449 (holding that "a court should not defer to an agency's interpretation of a statute if a 'judicial precedent hold[s] that the statute unambiguously forecloses the agency's interpretation' " (quoting Brand X, 545 U.S. at 982-83, 125 S.Ct. 2688 )).

Although Bastardo-Vale prematurely filed his petition for review before a final order of removal was entered, such an order has since been entered, and thus we now have jurisdiction under 8 U.S.C. § 1252(a)(1). See Khan v. Att'y Gen., 691 F.3d 488, 494 (3d Cir. 2012). The Government recognizes that we have jurisdiction and has moved to withdraw its motion to dismiss for lack of jurisdiction, which we will grant.

The IJ had jurisdiction under 8 C.F.R. § 1208.2 and the BIA had jurisdiction under 8 C.F.R. § 1003.1(b). When, as here, the BIA issues its own opinion on the merits, we review the BIA's decision, not that of the IJ. Mahn v. Att'y Gen., 767 F.3d 170, 173 (3d Cir. 2014) (citation omitted).

In his dissent, Judge McKee contends that the phrase "by regulation" in the asylum statute, 8 U.S.C. § 1158(b)(2)(B)(ii), operates as a limitation that precludes the use of case-by-case adjudication to determine whether certain crimes are particularly serious. There are several problems with this interpretation.
First, this reading overlooks the word "may" that precedes the phrase "by regulation." Id. The word "may" conveys permission for the agency to act in a particular way but does not mandate that the agency act only in that one fashion. May, Merriam-Webster, https://www.merriamwebster.com/dictionary/may (last visited July 26, 2019) (defining "may" as "have permission to" or "be free to"); May, Black's Law Dictionary (11th ed. 2019) (defining "may" as "[t]o be permitted to"); see Rossman v. Fleet Bank (R.I.) Nat'l Ass'n, 280 F.3d 384, 393 (3d Cir. 2002) (noting the "permissive sense" of the word "may").
Second, Congress knows how to limit an agency to rulemaking or to adjudication. For example, the Attorney General can parole aliens "for urgent humanitarian reasons or significant public benefit," but can do so "only on a case-by-case basis," not by using prospective rulemaking. 8 U.S.C. § 1182(d)(5)(A). Moreover, Congress has at times distinguished between mandatory and permissive uses of rulemaking. Compare 42 U.S.C. § 1395m(a)(1)(G) ("The Secretary [of Health and Human Services] shall specify by regulation the methodology to be used" for rendering certain kinds of payments) with id. § 1395m(a)(12) ("The Secretary may designate, by regulation ... one carrier for one or more entire regions to process all claims within the region for covered items under this section."). Similarly, Congress has at times required agencies to use rulemaking to achieve a certain result. See, e.g., 42 U.S.C. § 6924(a) (providing that if some conditions are met, "the Administrator [of the Environmental Protection Agency] shall promulgate regulations establishing ... performance standards"); id. § 7409(a)(1)(A) (providing that the Administrator of the Environmental Protection Agency "shall publish proposed regulations prescribing a national primary ambient air quality standard"). In short, Congress could have written the asylum statute so that the agency could proceed only by rulemaking or only by adjudication. Congress, however, has not done so here. The absence of such language makes clear that Congress did not displace the Attorney General's longstanding discretion to choose between rulemaking and adjudication. See PBW Stock Exch., Inc. v. SEC, 485 F.2d 718, 732 (3d Cir. 1973) (noting that "[t]he courts have consistently held that where an agency, as in this case, is given an option to proceed by rulemaking or by individual adjudication the choice is one that lies in the informed discretion of the administrative agency").
Third, as stated previously, Congress added the "by regulation" language within the context of the agency's regular use of case-by-case adjudication. Because Congress was aware of the agency's practice of adjudication, see Lorillard, 434 U.S. at 580, 98 S.Ct. 866, its inclusion of the "by regulation" language added another means by which the agency could categorize crimes as particularly serious: rulemaking. This interpretation of the "by regulation" clause accords with principles of administrative law. See SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) (observing that "there is ... a very definite place for the case-by-case evolution of statutory standards" because "problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule").
Finally, to the extent that Judge McKee asserts that Congress must confer adjudicatory powers upon the agency to determine which crimes are particularly serious, it has already done so. An IJ "conduct[s] proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). The IJ, among other things, "receive[s] evidence, and interrogate[s], examine[s], and cross-examine[s] the alien and any witnesses." Id. § 1229a(b)(1). Afterwards, the IJ "shall decide whether an alien is removable ... based only on the evidence produced in the hearing." Id. § 1229a(c)(1)(A). Congress has therefore authorized IJs to decide whether an alien is removable.
This decision, in turn, requires that an IJ consider whether there are grounds to order or not order an alien's removal. An IJ, for example, may consider a request for asylum, which includes evaluating whether there are legal impediments to receiving this relief, such as certain prior convictions. Thus, the authority to decide whether an alien is removable or eligible for relief from removal through asylum includes the authority to decide whether the alien committed a "particularly serious crime" that precludes asylum relief. See id. § 1158(b)(2)(A)(ii). As a result, Congress has delegated the power to adjudicate on a case-by-case basis to the agency.

The congressional enactments during this period also show that the regulatory authority did not displace the Attorney General's authority to also consider whether an alien committed a particularly serious crime on a case-by-case basis. Congress amended the immigration laws in the 1990s to limit the availability of asylum and other relief, St. Cyr v. I.N.S., 229 F.3d 406, 411 n.3 (2d Cir. 2000) ; Garcia v. I.N.S., 7 F.3d 1320, 1322 (7th Cir. 1993), and to "expedite" the removal of criminal aliens, Patel v. Zemski, 275 F.3d 299, 304 (3d Cir. 2001), overruled on other grounds by Demore v. Kim, 538 U.S. 510, 516, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) ; DeSousa v. Reno, 190 F.3d 175, 185 (3d Cir. 1999). To this end, Congress expanded the Attorney General's authority by adding the "particularly serious crime" bar to the asylum statute in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Congress also gave the Attorney General the authority to designate categories of offenses as particularly serious crimes that would bar asylum relief. Before this regulatory authority was granted, the Attorney General had evaluated whether an offense was a particularly serious crime on a case-by-case basis. Delgado, 648 F.3d at 1106 ; Frentescu, 18 I. & N. Dec. at 247. Because Congress added this regulatory authority in the context of other legislation that increased the grounds to remove aliens, it would be inconsistent with this goal to believe that Congress replaced a case-by-case adjudicatory process with a regulation-only process, which would slow the identification of qualifying offenses and remove consideration of facts that reveal whether the specific alien is a danger to the community. See 8 U.S.C. § 1158(b)(2)(A)(ii) ; Gao, 595 F.3d at 557 ("It would be a Herculean task to sift through each state's code and prospectively identify by regulation every single crime that would qualify as particularly serious." (internal quotation marks omitted)).
In addition, the caselaw landscape before 1996 and Congress's reaction to it also show that inclusion of the "by regulation" language was a reaffirmation of regulatory authority. Since In re Frentescu, the Attorney General could proceed by adjudication. In other words, the adjudication door was open. By the time Congress added this language in 1996, however, the Court of Appeals for the Ninth Circuit had closed the other door by holding that the agency could not use rulemaking. Komarenko v. INS, 35 F.3d 432, 436 (9th Cir. 1994). Aliens in other circuits also attacked agency rules designating crimes as particularly serious as ultra vires, arguing that crimes could be particularly serious only if deemed so by adjudication. See, e.g., Ahmetovic v. INS, 62 F.3d 48, 52 (2d Cir. 1995) (alien "contend[ed] that the BIA should have conducted a broad inquiry into the facts underlying her conviction in order to determine whether the crime was 'particularly serious.' "). By adding "by regulation," therefore, Congress ended this debate: it rejected Komarenko and allowed the agency to proceed by rulemaking. Contrary to Judge McKee's contention that the phrase is meaningless, it clarifies that both the adjudication and rulemaking doors are open to the agency, leaving the agency discretion to choose between them.
For these additional reasons, we conclude that the Attorney General has authority both to designate categories of offenses as particularly serious crimes and to decide whether an alien's offense constitutes a particularly serious crime on a case-by-case basis.

The differences in the statutes do not mean that the phrase "particularly serious crime" should be given a different meaning. While asylum is discretionary and withholding of removal is mandatory, and entitlement to asylum is met by a lower standard of proof than that required for withholding of removal, each statute reflects Congress's view that a "particularly serious crime" bars aliens from obtaining certain immigration relief.

Even if Bastardo-Vale did not waive this argument, there is likely enough evidence to uphold the BIA's determination that he committed a particularly serious crime.